# JACOB SIMONS

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Springfield April 2, 1894.*

1. CRIMINAL LAW—MURDER—*evidence—letters written by defendant and found in his possession.* On the trial of a man for the murder of a young woman by poison, letters found in his possession, addressed to the deceased and shown to be in the handwriting of the defendant, tending to prove the relations existing between them, and thus tending to prove the motive, are admissible in evidence against the defendant without direct proof that the letters had been delivered to the deceased.

2. SAME—*what are dying declarations.* Dying declarations are such as are made relating to the facts of an injury of which the person making them afterwards dies, under the fixed belief and moral conviction that immediate death is inevitable, without opportunity for repentance, and without hope of escaping the impending danger.

3. About twenty-five minutes before the death of a woman from poison, she stated to her sister that the defendant, to whom she was engaged to be married, had given her a capsule to bring back her monthly courses; that she gave way to this man. Before these declarations, in speaking to her two sisters about the capsule, she stated, "I believe it will kill me." Before making this statement she threw up her arms and said to one of her sisters, "Don't leave me any more." When the declarations were made her mind seemed to be perfectly clear, and one convulsion had followed another for over an hour, each with increased severity: *Held,* that the statements of the deceased were properly admitted in evidence against the defendant as dying declarations.

4. SAME—*witness not named on indictment.* It is not error to allow a witness to testify in a criminal case whose name is not on the indictment, and when no notice has been given that the witness would be called. It is a matter resting in the sound discretion of the court.

5. WITNESS—*impeachment—former conviction of perjury.* The fact that a defendant in a criminal prosecution may have been convicted of perjury in another State will not disqualify him as a witness. His conviction can only be shown for the purpose of affecting his credibility. For that purpose his conviction may be shown by the record, but not by parol, if objection is made to proof of the fact by parol.

6. EVIDENCE—*parol, to prove a conviction of infamous crime.* The judgment of the court where the conviction of a defendant is had, is the only competent evidence to establish the conviction, and that judgment can only be established by producing the record of the judg-

ment, or an authenticated copy of the record. It can not be shown by parol evidence, if objection to such evidence is made when offered.

7. SAME—*out of its proper order*. The trial court may, in its discretion, allow evidence in rebuttal which strictly should have been offered in chief.

8. PRACTICE—*excluding evidence after its admission*. While it is true a court has no right to admit improper evidence, yet when that has been inadvertently done, and the court, as soon as the mistake is discovered, promptly rules out the evidence, a judgment ought not, as a general rule, to be reversed for such an error.

9. SAME—*compelling witness to appear—party must take proper steps*. The record showed that on the trial of one for murder, a witness who had testified for the People, being called for the defendant, did not appear. The record failed to show that the witness had been subpœnaed, that an attachment had been asked or denied, or that the court was requested to take any action to compel the attendance of the witness: *Held*, that there was no ground of complaint shown, to the action of the court.

10. INSTRUCTIONS—*repeating*. Where the instructions given for a defendant contain all the law necessary to be given to the jury to enable them to pass upon his guilt or innocence, there is no necessity for giving other instructions.

WRIT OF ERROR to the Circuit Court of McLean county; the Hon. THOMAS F. TIPTON, Judge, presiding.

Messrs. PEIRCE & PORTER, for the plaintiff in error:

Evidence as to a dying declaration ought to be received with caution. The testimony in this case is not sufficient to warrant the admission of the dying declarations. *Starkey* v. *People*, 17 Ill. 17; *Digby* v. *People*, 113 id. 123; *Westbrook* v. *People*, 126 id. 81; *Tracy* v. *People*, 97 id. 101; *Rex* v. *Taylor*, 3 Cox's C. C. 84.

Any hope of recovery, however slight, existing in the mind of the deceased at the time the declarations are made, will render the declarations inadmissible. 3 Russell on Crimes, (9th Am. ed.) 252; *Digby* v. *People*, 113 Ill. 123; *Errington's case*, 2 Lew. 148; *Rex* v. *Crockett*, 4 C. & P. 444; *Railroad Co.* v. *Slipsbury*, 7 id. 187; *People* v. *Hodgdon*, 55 Cal. 76; *Jackson* v. *Commonwealth*, 19 Gratt. 656.

The use of the expression, "I am sure to die," is not sufficient to warrant the admission of a dying declaration, and does not indicate that state of mind of the deceased making the statements thereafter admissible. *Railroad Co.* v. *Osman*, 15 Cox's C. C. 1.

Dying declarations, though proved to have been made by persons in a dying state, are not admissible, unless it also appears that the individual knows that he is in immediate danger of dissolution; and the opinions of witnesses as to the condition or state of the individual are not admissible. See 2 Russell on Crimes, 250; Wharton on Crim. Ev. par. 276.

Before the evidence of a dying declaration is admissible to go to the jury, the evidence must show to the court, beyond a reasonable doubt, that the party is *in extremis*. *Starkey* v. *People*, 17 Ill. 20; *Tracy* v. *People*, 97 id. 101.

Evidence which is mere matter of opinion is not admissible. *(Sahlinger* v. *People*, 102 Ill. 241.) Nor will mere opinion that death will result from the injury render dying declarations admissible. 1 Bishop on Crim. Proc. sec. 1212; *Rex* v. *Van-Putchell*, 3 C. & P. 629; *Smith* v. *State*, 9 Humph. 9; *Rex* v. *Foster*, 10 Cox's C. C. 368.

That it was improper to compel the defendant to answer on cross-examination, over his objection, the question as to whether he was convicted of another crime, or the crime of perjury, see 1 Bishop on Crim. Proc. sec. 1122; *Hoberg* v. *State*, 3 Minn. 262.

The evidence was not competent for the purpose of impeaching defendant's testimony. That could only be done by proving his general reputation for truth and veracity to be bad. *Gifford* v. *People*, 87 Ill. 211; *Dimick* v. *Downs*, 82 id. 570; *Frye* v. *Bank*, 11 id. 367.

Our own court and other courts have decided that those who undertake to discredit a witness or party because of his conviction of an infamous crime must make legal proof of that fact, and that the same can only be proved by the record,

including the judgment of a court of competent jurisdiction. *Bartholomew* v. *People*, 104 Ill. 607; Greenleaf on Evidence, sec. 375; *People* v. *Herrick*, 13 Johns. 82; *Commonwealth* v. *Gorham*, 99 Mass. 420.

The error in admitting this evidence was not cured by its subsequent exclusion. *Quinn* v. *People*, 123 Ill. 333.

The letters were incompetent, because they were irrelevant to the issue, did not contain any threats or admissions, and nothing throwing any light on the issue in the case. They did tend to prove that the defendant was immoral, and had been guilty of committing sexual intercourse with some individual not shown to be the deceased. That evidence of this kind is not competent as against him, see *Farris* v. *People*, 129 Ill. 521; *Gifford* v. *People*, 87 id. 211.

That the letters were incompetent evidence as against the defendant, because they had been unlawfully obtained, see *Boyd* v. *United States*, 116 U. S. 616.

Mr. JOHN A. STERLING, State's Attorney, Mr. M. T. MOLONEY, Attorney General, Mr. T. J. SCOFIELD, and Mr. M. L. NEWELL, for the People:

The rule of law, well established as to the admissibility of dying declarations, is laid down in the following cases: *Barnett* v. *People*, 54 Ill. 329; *Scott* v. *People*, 63 id. 511; *Starkey* v. *People*, 17 id. 17; *State* v. *Baldwin*, 79 Iowa, 714; *State* v. *Nash*, 7 id. 347; *People* v. *Lee*, 17 Cal. 76.

The fact that deceased was conscious of impending death may be gathered from the circumstances of the case, the nature of the injury and state of the body, and from expressions used by the deceased. Taylor on Medical Jur. 33, 34; *Starkey* v. *People*, 17 Ill. 17; *State* v. *Nash*, 7 Clarke, 347; *Kilpatrick* v. *Commonwealth*, 7 Casey, 198; *Commonwealth* v. *Roberts*, 108 Mass. 301; *People* v. *Ybarra*, 17 Cal. 166; *State* v. *Gillick*, 7 Clarke, 287.

The statements made by the deceased form a part of the *res gestæ* in this case. The rule as to their admissibility on this ground is laid down in the following cases: *Railway Co. v. Becker*, 128 Ill. 545; *Lander* v. *People*, 104 id. 248; *Insurance Co.* v. *Mosley*, 8 Wall. 397; *Paryear* v. *Commonwealth*, 83 Va. 51; *People* v. *Vernon*, 35 Cal. 49; *Elkins* v. *McKean*, 79 Pa. St. 493; *Commonwealth* v. *McPike*, 3 Cush. 181; *State v. Baldwin*, 79 Iowa, 704; *State* v. *Schmidt*, 73 id. 469; *State v. Driscoll*, 72 id. 583; *Commonwealth* v. *Hackett*, 2 Allen, 136; *Driscoll* v. *People*, 47 Mich. 413; 1 Greenleaf on Evidence, sec. 108.

Letters written by defendant are admissible in evidence against him if relevant to the issues. These letters tend to prove motive. Even though they were found in his possession, and there is no showing that they were ever delivered to deceased, they are competent. *State* v. *Stair*, 87 Mo. 268; *State* v. *Briggs*, 68 Iowa, 416; *People* v. *Cassidy*, 133 N. Y. 612; Wharton on Evidence, sec. 1123.

A medical witness, in giving his opinion as an expert, is not confined to opinion derived from his own observation and experience, but he may give an opinion based upon information derived from medical books. *Siebert* v. *People*, 143 Ill. 571.

The remarks complained of as having been made in the opening statement and closing argument for the People were proper. *Siebert* v. *People*, 143 Ill. 571.

It is not error for the trial court to permit witnesses whose names are not indorsed on the indictment, to testify for the prosecution, without notice to the defendant. It is discretionary with the court. *Bulliner* v. *People*, 95 Ill. 394; *Logg v. People*, 92 id. 598; *Smith* v. *People*, 74 id. 144.

Even though the admission of the evidence complained of was improper, the error was cured by its exclusion from the consideration of the jury. *Railroad Co.* v. *Fietsam*, 123 Ill. 519.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

The plaintiff in error, Jacob Simons, was indicted at the February term, 1893, of the circuit court of McLean county, for the murder of Susie Hoover, by administering strychnine poison to her. To the indictment the defendant pleaded not guilty, and on a trial before a jury he was found guilty as charged in the indictment, and his punishment was fixed at imprisonment in the penitentiary for life. The court over-ruled a motion for a new trial and rendered judgment on the verdict, to reverse which this writ of error was sued out.

Upon an examination of the record it appears that Susie Hoover died at the home of her sister, Mrs. Ara Banks, in McLean county, on the 20th day of October, 1892. She was then past eighteen years of age, and a daughter of A. L. Hoover. In November, 1889, Hoover moved from McLean county to Missouri. His family then consisted of himself, his wife, a sister of the defendant, his two daughters, Anna and Susie Hoover, by a former marriage, and Stella Wil-loughby, a daughter of his then wife by a former marriage. The defendant went with Hoover to Missouri to assist him in taking care of stock that he was shipping to that State. After the Hoovers arrived in Missouri the defendant lived in the family, and did chores and assisted some about the barn. He was then about forty years old, and Susie Hoover was a girl of fifteen. Soon after the family had arrived at Freeman, Mo., the defendant commenced to pay attention to Susie. To this Hoover and his wife objected, and to all outward appear-ance it was stopped, but it appears from the testimony that defendant secretly kept up his relations with the girl, and from letters read in evidence it seems that from June, 1890, until the death of Susie Hoover, he had frequent illicit intercourse with her. In the month of September, 1892, Mrs. Hoover died, and her body was brought to McLean county for burial. The family and the defendant came with the remains, and

stopped at the house of Mrs. Banks, a married daughter of Hoover. Hoover concluded to remain in this State, and after the burial of his wife returned to Missouri to settle up his business. In a short time he came back to this State, and again started for Missouri on Wednesday, October 19, 1892, the day before Susie's death. While the family was stopping at the home of Mrs. Banks, the defendant took Susie to Leroy, to Farmer City, and one or two other places. While at Farmer City, on Thursday before the death of Susie, they stopped with one Halloway, and took dinner. While there they made arrangements to return to Halloway's place on the next Thursday and get married. After leaving Halloway's the defendant and Susie went to Whitsell's, a sister of the deceased, and remained there over night. Next day the defendant returned to Banks' place and remained until Sunday morning, when he left, and did not return until Thursday, the 20th, about noon. Soon after arriving, the defendant went up stairs into a room where Anna Hoover was sick, and asked her how she was, and then went across the hall where he kept his trunk, which he packed and tied a rope around it. He then went down stairs, and the family went to the table for dinner. About one o'clock the defendant was asked to take dinner, but declined. He remained in the dining room until dinner was over, and while Susie and Miss Willoughby were looking after the dishes he spoke to Susie, and a whispered conversation occurred between them for a moment, when the defendant again went up stairs to the room where he had left his trunk. In a few minutes Susie followed, and the two were in the room alone from five to ten minutes. During this time Anna, the sick sister across the hall, was alarmed to hear Susie exclaim, "Don't, Jake!" three times, and the defendant exclaim, "Yes, Susie," three times. She at the same time heard a noise in the room, like a scuffle between the parties. A short time afterwards Miss Willoughby went to the room where the two parties were, and soon Banks came in. The trunk was taken down stairs,

and the defendant and Banks left in a wagon for Ellsworth, a railroad station a few miles distant. In about twenty minutes after the defendant left in the wagon, Susie was taken sick with convulsions, and died in a little less than two hours afterwards. Dr. Patch, of Ellsworth, having been called, arrived at the house ten minutes after four o'clock. He found Susie lying on the dining room floor. He carefully examined all the symptoms, and questioned the dying girl fully in regard to her condition and the cause of the difficulty. After the doctor arrived she had five or six convulsions, and died in a convulsion about twenty minutes after his arrival, at 4:30 P. M. The nature and cause of the sickness were fully explained by Susie to the doctor a few minutes before her death. The physicians all agree that the symptoms disclosed the fact that death was the result of strychnine poisoning. That evening the doctor in charge removed the stomach and uterus from the body. The uterus contained a fœtus from four to eight weeks old.

On the trial the court permitted the prosecution to prove that Susie Hoover stated, about twenty-five minutes before her death : "I have been keeping company with a young man. We are engaged to be married. I thought that maybe I was in the family-way. My monthly sickness didn't come around. He got me some medicine at Farmer City,—a capsule,—and gave it to me to take, to bring my monthly sickness on me." "What did she say, if anything, about having submitted to this man?" "She said, 'I gave way to him.'" Before this evidence was admitted, it was proven before the court that the deceased stated to her two sisters, in speaking about the capsule, "I believe it will kill me." Before making this statement, in her extreme suffering, she threw up her arms and said to one of her sisters, "Don't leave me any more," and at the same time, as the witness expressed it, "grasped around me."

Dying declarations are such as are made, relating to the facts of an injury of which the party afterwards dies, under

the fixed belief and moral conviction that immediate death is inevitable, without opportunity for repentance, and without hope of escaping the impending danger. (*Starkey* v. *The People*, 17 Ill. 17.) When the declarations were made the mind of the deceased seemed to be perfectly clear. One convulsion had followed another for over an hour, and each succeeding one with greater severity, and when she declared, "I believe it will kill me," and implored her sister not to leave her, in the manner disclosed by the evidence, it is apparent that she fully realized that death was near and inevitable. From the evidence before the court but one conclusion could be reached, and that is that the deceased believed and fully realized that the approach of death was near at hand, from which she had no hope of escape. We think the evidence may be regarded as dying declarations, and was properly admitted by the court as such.

The defendant was called as a witness, in his own behalf, and on cross-examination he was asked if he was not indicted and convicted of perjury in the circuit court of Barber county, West Virginia, in 1880. A general objection was interposed to the question, overruled, and the witness answered, "I was." The ruling of the court in the admission of this evidence is relied upon as error. The fact that the defendant may have been convicted of perjury would not disqualify him as a witness. His conviction could only be shown for the purpose of affecting his credibility. For that purpose the People had the right to prove a conviction, but they had no right to prove the fact by parol evidence. The judgment of the court where the conviction was had was the only competent evidence to establish a conviction, and that judgment could only be established by producing the record of the judgment or an authenticated copy of the record, as we have heretofore held in *Bartholomew* v. *The People*, 104 Ill. 608. It is clear that the prosecution had no right to prove, by parol, that the defendant was convicted of an infamous offense, but

the evidence was not objected to on the ground that the fact could not be proved by parol. It was not suggested to the court that the fact of conviction could only be proved by an authenticated copy of the record. Had the objection been made on this ground, doubtless the court would have excluded the evidence. The general objection made by the defendant was not sufficient. Moreover, on a subsequent day the court excluded the evidence from the jury, and directed them not to consider it. While it is true a court has no right to admit improper evidence, yet when that has inadvertently been done, and the court, as soon as the mistake has been discovered, promptly rules out the evidence, a judgment ought not, as a general rule, to be reversed for such an error.

A large number of letters written by the defendant to Susie Hoover were admitted in evidence, and this ruling is objected to by the defendant. These letters were proved to be in the handwriting of the defendant. They tended to prove the relations existing between him and the deceased, and thus tended to prove the motive. These letters were all found in the possession of the defendant after his arrest, and it was not proved directly that they had been delivered to the deceased when written, and subsequently obtained by him from the possession of the deceased, yet, under the authorities, it seems to be well settled they were admissible. *State* v. *Stair,* 87 Mo. 268; *State* v. *Briggs,* 68 Iowa, 416; *The People* v. *Cassidy,* 133 N. Y. 612; Wharton on Evidence, sec. 1123.

It is also claimed that the court refused to compel the attendance of witnesses on behalf of the defendant. The only ground for this contention which we find in the record is the fact that Mrs. Dr. Patch, who had testified on behalf of the People, being called on behalf of the defendant, did not appear. But the record fails to show that she had been subpœnaed, that an attachment was requested or denied, or that the court was requested to take any action whatever to compel the attendance of the witness. Under such circumstances we

fail to see any ground upon which the defendant can complain of the action of the court in this regard.

It is also claimed that the court erred in permitting a witness to testify for the People, in rebuttal, when the evidence was only competent in chief, and on the further ground that the name of the witness was not indorsed on the indictment, nor was- defendant notified that the witness would be called to testify. The court may, in its discretion, allow evidence on rebuttal which strictly should have been offered in chief. It has frequently been held not to be error to allow a witness to testify whose name is not on the indictment, and where no notice has been given that the witness would be called. It is a matter resting in the sound discretion of the court. *Bulliner* v. *The People*, 95 Ill. 394.

It is also claimed that improper remarks were made by the State's attorney in his opening statement of the case to the jury, and also that counsel assisting the State's attorney used certain improper language in his closing argument to the jury. Without repeating what was said, we find nothing in the remarks of counsel not warranted by facts in the case.

It is also contended that the court erred in refusing defendant's first, second, third, fourth, fifth, sixth, seventh and eleventh instructions. None of the instructions given or refused are set out in the abstract. Upon referring to the transcript of the record, however, we find that the court gave for defendant thirty-five instructions and refused eleven. As none of the instructions are numbered as they appear in the record, it is difficult to determine which refused instructions defendant's counsel insist should be given. But be that as it may, the instructions given for defendant contain all the law necessary to be given to the jury to enable them to pass on the guilt or innocence of the defendant. There was therefore no necessity for giving any of the instructions which the court refused.

But it is said the evidence was insufficient to establish the guilt of the defendant. Upon this branch of the case but

little need be said.   It is beyond question that Susie Hoover
was pregnant at the time of her death.    The *post mortem*
demonstrated that fact.   That the defendant was her seducer
and the cause of her ruin was fully established by his own
letters read in evidence before the jury.   There is abundance
of evidence that he had agreed to marry this unfortunate girl.
Indeed, it was admitted in his evidence.   On Thursday, Oc-
tober 13, one week before the death of the deceased, the de-
fendant, in the presence of the Halloways, agreed upon the
time and place of the marriage, October 20, at their residence
in Farmer City.   The condition of the deceased had become
known to her sister, Mrs. Banks, and the defendant knew and
realized that her condition could not be concealed from others.
Immediate action of some kind was required.   If the defend-
ant desired to marry the girl, she was of age, and he could
have done so at any time, regardless of any objections from
her father or any member of the family.   But it is apparent,
from the evidence, that he did not intend to marry her.   After
returning with her from Farmer City, when the day of the
marriage was fixed, he saw the deceased but once, and that
was only for a short time at Arrowsmith's, on Sunday, until
he appeared at Banks' place on Thursday, the 20th, the day
they had agreed upon to be at Halloway's and have the mar-
riage take place.   When he came to Banks' on Thursday fore-
noon, he did not come there for the purpose of carrying out
his engagement of the week before.   This is manifest from his
conduct.   On Wednesday the defendant was at Bloomington,
and learned that the father of the deceased would leave that
evening for Missouri.   He then started at once for Ellsworth,
and the next day, about noon, arrived at Banks'.   Upon his
arrival he at once went to the room he had occupied, and
packed and strapped his trunk.   Up to this time he had no
conversation with the deceased.   He then went down stairs,
and the family sat down to the dinner table.   He declined to
eat.   After dinner was over, a conversation in whisper is had

between defendant and Susie. He then went up-stairs, and she soon followed him to the room he had occupied. The two were in that room alone from five to ten minutes, and while there the sick sister across the hall heard them scuffling and Susie crying. She also heard the remark, "Don't, Jake!" three times in succession. Doubtless that was the time the deceased was induced by the defendant to take the fatal dose, which she declared in her dying statement the defendant had given her to bring on her monthly sickness. Immediately after this occurrence the defendant left, and within thirty minutes the deceased was in convulsions, which soon resulted in her death. From the evidence it is beyond question that the death of Susie Hoover was caused by strychnine poison, and the evidence all points to the defendant as the person who caused her to take it.

The anxiety and uneasiness manifested by the defendant after leaving the Banks place, during the entire afternoon, until he heard of the death of Susie Hoover, are inconsistent with his innocence. When Banks left defendant at the depot at Ellsworth, defendant said, "If anything happens to Susie or Anna let me know." He had left a niece, Miss Willoughby, at the same place, but he felt no anxiety in regard to her,— it was the Hoovers who were weighing on his mind. About three o'clock that afternoon, Mr. Bone, a neighbor, came in after a doctor, and the defendant inquired of him what was wrong at Banks'. Bone said he supposed Anna was worse. The defendant then said if anything happened to Hoover's girls to let him know,—Susie Hoover especially. About one hour later the defendant called at the doctor's residence and inquired, "Did the doctor go out there?" Again, the same afternoon he inquired of a party at the post-office in reference to the Banks, and about six o'clock he met a young lady who made her home there, but who had been away since morning, and asked her who was sick at Millard Banks'. She told him Anna. He replied there must be some one else sick. The

doctor had then returned, and defendant went to him with the same inquiry, but receiving no satisfactory answer he returned to the young lady, and met a man named Reed, who informed him that Susie Hoover was dead. Why all this anxiety and inquiry, unless he knew that Susie Hoover had taken something which might endanger her life?

It appears from the record that a chemical analysis of the stomach was made about three months after the death of the deceased, and no detectable quantity of strychnine was found, and some importance is attached to this fact in the argument. From an examination of the evidence it will be found that, as a general rule, when death is produced from strychnine poison, traces of the poison may be detected in the stomach. But such is not always the case. Where a dose is given which is only sufficient to produce death, and death ensues, no trace of the strychnine will be found in the stomach. The reason for this, as disclosed by the evidence, is, where the exact amount of poison is given to produce death the poison will be destroyed in doing its work; it will be absorbed and eliminated; it will change its relation so it can not be detected. From a half grain to two grains of strychnine is ordinarily regarded as sufficient to produce death. Here, if the defendant gave to the deceased what might be termed an exact fatal dose, no portion of that taken would be found in the stomach, for the obvious reason it was all taken up by the blood and carried to the nerve centers, where it produced its fatal work. Moreover, one-fifth of a grain may remain in a full stomach and it can not be detected by the most scientific test that may be resorted to. There may be other exceptions to the general rule. The fact, therefore, that the chemist in this case failed to detect traces of poison does not overcome the undisputed evidence in the case that the deceased came to her death from strychnine poison.

We perceive no reason for disturbing the judgment of the circuit court, and it will be affirmed. *Judgment affirmed.*