(No. 14369.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. PAUL E. GORMACH et al. Plaintiffs in Error.

*Opinion filed February 22, 1922—Rehearing denied April 7, 1922.*

1. CRIMINAL LAW—*effect of rule of idem sonans.* Under the rule of *idem sonans,* which applies to both civil and criminal proceedings, a mere variance between the spelling of a name in the pleadings and the correct spelling as shown by the proof is not fatal if the two spellings have substantially the same pronunciation, so that the defendant cannot be misled in preparing his defense.

2. SAME—*when rule of idem sonans may be applied.* The requirement that the name of the party injured by the commission of the crime must be alleged in the indictment is for the protection of the defendant in preparing and making his defense, and where an indictment for murder spells the name of the party killed as "Weinstraub" whereas the proof shows that the correct name is "Weintraub," the rule of *idem sonans* may be applied and the variance held not to be fatal.

3. SAME—*defendant has burden of proving an alibi.* The burden of establishing the defense of an alibi is on the defendant, and to maintain the same it is incumbent upon him to prove facts which, when considered in connection with all the evidence relied upon to establish his guilt, is sufficient to create in the minds of the jury a reasonable doubt of the truth of the charge.

4. SAME—*jury are judges of credibility of alibi witnesses.* It is the province of the jury before whom the witnesses appear and testify, to decide, in cases where the evidence is conflicting, as to what testimony shall be believed, and while the jury cannot disregard the testimony of alibi witnesses, they are the judges of the credibility of such witnesses and of the weight of their testimony.

5. SAME—*when reviewing court will not reverse a conviction.* A reviewing court should not reverse a criminal case on the facts, which have been passed upon by a jury, unless the court can say that there is a reasonable doubt of guilt and that the verdict must have been the result of misapprehension or passion and prejudice.

6. SAME—*when admission of evidence as to whereabouts of defendants on other occasions is not error.* Where several persons are being tried for murder, the admission of evidence as to their whereabouts on two occasions a few days before and after the murder is not error, where such evidence does not tend to prove them guilty of other crimes but merely tends to show that they were acquaintances and associates.

7. SAME—*when admission of evidence as to widow's family can not be complained of in murder trial.* In a trial for murder the widow of the victim should not be asked if she has any children, as such question is not material and tends to prejudice the defendant, but if no objection is made to the question and the court sustains a motion to strike out the answer of the witness that she has four, the judgment should not be reversed merely because such proof was improper.

8. SAME—*the practice of giving a lengthy instruction defining reasonable doubt is not approved.* The practice of giving a long instruction or a large number of instructions defining the term "reasonable doubt" is not approved, as it tends to confuse rather than enlighten the jury; but the giving of two instructions on such subject, even though one of them is long, is not ground for reversal if they contain no incorrect statements.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. FRANK JOHNSTON, JR., Judge, presiding.

LEWIS A. HAUSCHILD, (THOMAS E. SWANSON, of counsel,) for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, and JAMES B. SEARCY, (EDWARD E. WILSON, CLYDE C. FISHER, and HENRY T. CHACE, JR., of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Plaintiffs in error, Paul E. Gormach, George Spider and Albert Glenz, (hereafter referred to as defendants,) were convicted in the criminal court of Cook county of murder and sentenced to the penitentiary for a term of thirty years. The indictment charged them with murdering Aaron Weinstraub by shooting him with a revolver. When the verdict was returned defendants made motions in arrest and for a new trial, which the court overruled and rendered judgment on the verdict.

It is alleged the State failed to prove the man who was shot and killed was the man charged in the indictment to

have been murdered by defendants. The homicide occurred in the saloon of Sam Cohen, Henry Friedman and Max Eisen, at the northeast corner of Potomac and Leavitt streets, in Chicago, about 9:20 o'clock in the evening of November 13, 1920. Several men were in the saloon and some of them were playing cards. Some men entered the saloon and cried "Hands up!" and a shot was fired which killed the deceased. The indictment alleged his name was Aaron *Weinstraub.* The proof showed his name was Aaron *Weintraub.* Counsel contend that as the name of the man killed was descriptive of the offense it was necessary to prove the man killed was the man alleged in the indictment, and that Weinstraub and Weintraub are not *idem sonans.*

The rule is that the name of the person injured by the offense charged must be stated, and a failure to state it or a material variance between the statement and the proof is fatal, and the application of that rule has resulted in the reversal of many cases by this and other courts. In some of the cases the party alleged to have been injured was not the party proved to have been injured, and in some of them the person injured was alleged to be a corporation and there was a failure to prove there was any such corporation. In stating the name of the person alleged to have been injured by the offense charged, a slight variation in orthography in the name proved has sometimes been held fatal and sometimes not. The rule of *idem sonans* applies to both civil and criminal proceedings. It is well stated in 14 R. C. L. 207, to be: "Where the name as written in the indictment may be pronounced in the same way as the name given in the evidence, although such may not be the strictly correct pronunciation, the variance will not be regarded as fatal unless the variant orthography be such as would be likely to mislead the defendant in preparing his defense." A mere variance in the letters with which the names are spelled is not fatal if they are pronounced substantially the same.

Defendants insist that there is a marked difference in pronouncing the name Weinstraub and Weintraub, and that the rule of *idem sonans* does not apply. This court has held the following names are not *idem sonans:* Holdberg and Goldberg, in 287 Ill. 238; Cierniak and Czerionak, in 269 Ill. 330; Rosalia and Rosetta, in 258 Ill. 502; Meyer and Meyers, in 143 Ill. 634. In *Barnes* v. *People,* 18 Ill. 52, defendant was indicted for stealing a horse belonging to Dougal McGinnis and the proof showed the horse belonged to Dugald McInnis. The court said the names in ordinary enunciation would be indistinguishable; that it would require particular distinctness in enunciation to make the difference apparent, and the rule of *idem sonans* applied. *Rivard* v. *Gardner,* 39 Ill. 125, held that where a bill in chancery named Sinclair as defendant but summons was issued against and served on St. Clair it was a clear case for the application of the rule of *idem sonans.* In *Gross* v. *Village of Grossdale,* 177 Ill. 248, Frank Bettie was appointed a commissioner to estimate the cost of a proposed local improvement. The report was signed Frank Beattie, and the court applied the rule of *idem sonans.* In *Lyon* v. *Kain,* 36 Ill. 362, the name "Emmonds" was written in the body of a deed as the name of the grantor but was signed "Emmens," and the court held the names were *idem sonans.* In *People* v. *Spoor,* 235 Ill. 230, defendant was convicted of bigamy. The indictment alleged the name of the woman he first married was Sarah Staunton. The proof showed her name was Sarah Stanton, and the trial court instructed the jury that the variance was not material, and this court held that was not error. *Guertin* v. *Mombleau,* 144 Ill. 32, was an ejectment suit, and by a deed in the chain of title the premises were conveyed to Mitchell Allen, and a deed signed by Mitchell Allain as grantor was held good as *idem sonans.*

The rule requiring the name of the party injured by the commission of the crime charged to be alleged in the

indictment is for the protection of the defendant in preparing and making his defense. In *People* v. *Weisman,* 296 Ill. 156, defendant was charged with burglary and larceny from a bank. The name of the bank alleged in the indictment was First National Bank of Marissa, Illinois. Witnesses for the People referred to it as First National Bank of Marissa, which was, in fact, its corporate name. It was urged in this court that there was a variance between the indictment and proof in that respect. The court said: "The modern rule is that a variance as to names alleged in an indictment and proved by the evidence is not to be regarded as material unless it shall be made to appear to the court that the jury were misled by it or that some substantial injury was done to the accused thereby, such as that by reason thereof he was unable to intelligently make his defense or was exposed to the danger of a second trial on the same charge. (1 Wharton on Crim. Evidence, 288; *State* v. *Long,* (Mo.) 213 S. W. 436.) There is no possible theory upon which it can be said that plaintiff in error has been materially injured upon the trial by reason of the alleged variance or that he will be prejudiced hereafter by the danger of having again to answer this charge." What was there said is applicable here. There was but one man killed in the saloon the night of November 13. That man, though his name was mis-spelled in the indictment as Weinstraub, was the man killed by the men, or one of them, who came into the saloon about 9:20 P. M., commanded those present to hold their hands up and fired the shot which killed Weintraub. The difference in the sound made by pronouncing the names Weinstraub and Weintraub is not great unless particular distinctness is used in enunciation. Defendants were in no way prejudiced in making their defense nor are they in any danger of hereafter having to answer the charge of murdering Weintraub. Applying the modern rule as stated in *People* v. *Weisman, supra,* there was no ma-

terial variance between the indictment and proof necessi-
tating a reversal of the judgment.

It is further contended the evidence was not sufficient
to sustain the verdict. It is insisted the proof that it was
defendants who attempted to hold up the saloon, or the
crowd in it, is of itself too uncertain to sustain the con-
viction, and that that proof was discredited by defendants'
proof of alibi. Defendants were not known to any of the
persons in the saloon before the homicide. The saloon was
owned and the business carried on by Cohen, Friedman and
Eisen. Friedman testified he was in charge of the business
November 13 until about ten minutes before 9 P. M. De-
fendant Glenz and another man came in the saloon a few
minutes before he went off duty. Glenz stepped up to the
bar and called for beer, which he drank and paid witness
a half dollar. The man who came in with Glenz went back
to the toilet in the rear. After Glenz drank his beer he and
the other man went out of the saloon, and the witness left
before the shooting took place. Someone told him his place
had been held up, and he went back and found Weintraub
lying on the floor. He testified he had never seen Glenz
before he came in the saloon and bought the beer, but tes-
tified he identified the man who bought the beer as defend-
ant Glenz. Ike Flangel was in the saloon when the shooting
occurred. He testified two men came in the saloon and
commanded "Hands up!" three or four times and then fired
a shot. He said defendant Spider was one of the men;
that he was about three feet from him; that Spider had
a gun in his hand and also had a small leather bag, and
that after the shot was fired the men left the saloon. He
was shown a leather bag, and at first said it was the one
Spider had in the saloon but later said he could not be cer-
tain about it. He had never seen Spider before, but tes-
tified he was the man he saw in the saloon with a gun com-
manding those present to hold up their hands. Sam Cohen
testified he was in the saloon when Weintraub was shot.

302—22

Defendant Spider was the first man who came in with a gun. He also had a bag on his arm, and said, "Hands up!" and fired a shot. He said Spider had a gun in each hand. Two men rushed into the saloon and another was swinging the door back but he could not see him. The witness had never seen Spider before, but he testified he recognized him as the man he saw in the saloon with the guns. He also testified a leather bag shown him looked like the one he saw Spider have in the saloon. Hyman Kerrish testified he was walking past the saloon about the time of the shooting and some men ran out of it and to a Ford car that was standing at the curb. One of the men bumped into him. They jumped into the machine and drove east on Potomac street to Hoyne avenue and then turned north. He testified he saw the face of the man who ran against him and that defendant Gormach was the man.

The foregoing is a statement of the substance of the testimony of the People's witnesses who identified defendants as being the men who attempted to hold up the saloon and who fired the shot which killed Weintraub. There was some other testimony that about that time a Ford automobile drove rapidly away from the saloon. Beatrice Miller testified she and five other girls were at the corner of Potomac street, near Hoyne avenue; that a Ford car passed them going east on Potomac street; that it was going very fast, and near the corner of Hoyne avenue something was thrown out of the car, which turned north on Hoyne avenue. She picked up a leather bag, which was the object she had seen thrown from the car, and gave the bag to a police officer immediately. The bag was so light she opened it, but there was nothing in it except a box of cartridges. The witness testified she saw another car following in the same direction the Ford went. Abe Fried testified he was in the saloon when the shooting occurred. He was greatly excited and did not identify any of defendants. After the men who did the shooting left the saloon he went out and

saw a Ford rapidly driving east. He jumped in a car with another man and followed it east to Hoyne avenue, where it turned north. He saw something thrown out of the car about the corner of Hoyne avenue but did not stop to see what it was. He saw a girl pick it up.

Defendant Glenz took the stand and testified, denying he was at the saloon at the time in question and giving an account of his whereabouts at, prior to and subsequent to the time of the shooting. Defendants Spider and Gormach did not testify. The defendants on the trial produced evidence by different witnesses for the purpose of showing their whereabouts during the day of the homicide from late in the afternoon until after the time the hold-up and shooting occurred. From this testimony it appears that Glenz, Gormach and Spider were all at the Revere Hotel during a part of the afternoon at least. Gormach and Glenz left there in a car with Dr. Michelson, who testified he had been called to attend Spider's wife, who was sick in the hotel with an attack of appendicitis. They got out of the doctor's car at Chicago avenue and Lake Shore drive and went to Glenz's home. The mother of Glenz testified she got some supper for her son and Gormach and that they left shortly; that her son went to a barber shop and Gormach returned to her house later in the evening, before nine o'clock. Four witnesses testified to Glenz being present at Tomasello's barber shop that evening, playing a violin; that he was still there when each of them left, the last one leaving about 8:40. The barber and owner of the shop stated he worked on Glenz and that the latter left his shop about 9:05 P. M. The barber shop is about three blocks from where Glenz's mother lived and about six blocks from the saloon where the hold-up took place. Glenz's sister testified her brother came back from the barber shop, and that he and Gormach, who had been waiting at her mother's house for Glenz, left the house at 9:10 P. M. Gormach's father testified his son had been at the father's house that even--

ing about 7:15 and wanted to borrow $12 to pay his board and room, which the father obtained for him. Glenz took the stand in his own behalf but the other two defendants did not testify. Glenz denied any connection with the hold-up and shooting and told where he was that day before and after the time of the shooting; that he had been in the Tomasello barber shop, and after meeting Gormach at Glenz's mother's home about nine o'clock the two of them went to the Revere, where they arrived shortly after nine, and met William O'Keefe, and saw Spider, his wife and one Rubettis. He also gave an account of where he was and what he did from the time they reached the Revere until late that night. Rubettis and O'Keefe, two alibi witnesses for defendants, testified they are vaudeville performers, were stopping at the Revere, and had just arrived in town the day before the homicide. From their testimony it appears they were acquainted with defendants. O'Keefe had known Gormach and Glenz for some time previous, and Rubettis had known Spider and Gormach before, each meeting the other defendant whom he had not met before, that night. From their testimony the three defendants were all at the Revere about 9:30 and thereafter till late that night. These two witnesses having attended different shows that evening, upon their return near 9:30 found all of the defendants at the Revere, Gormach having previously told O'Keefe he would see him there that night shortly after nine. They also saw Spider in his room at the hotel with his sick wife, and all of them, O'Keefe, Rubettis and the three defendants, were in Spider's room about ten o'clock that evening.

Defendants contend the testimony shows their whereabouts before, at the time and after the shooting, and hence it was impossible for them to have been at the place where it occurred. There were some discrepancies in details of some importance in the testimony of some of the witnesses mentioned, but we have thought it unnecessary to set the

same out in detail. If the testimony of the alibi witnesses was correct and true and proven by credible witnesses the defendants were doubtless not present at the shooting. The burden of establishing the defense of an alibi is on the defendant, and to maintain it it is incumbent upon him to prove facts and circumstances which, when considered in connection with all the evidence relied upon to establish his guilt of the crime charged, is sufficient to create in the minds of the jury a reasonable doubt of the truth of the charge. (*Carlton* v. *People,* 150 Ill. 181; *Hauser* v. *People,* 210 id. 253.) It is the province of the jury, before whom the witnesses appear and testify, to decide in cases where the evidence is conflicting and contradictory as to what evidence and which witnesses shall be believed. The jury would not be warranted in disregarding the testimony of alibi witnesses, but the jury were the judges of the credibility of the witnesses and the weight of their testimony. A reviewing court should not reverse a criminal case on the facts, which have been passed upon by a jury, unless the court can see and say that the verdict was reached as a result of passion or prejudice. (*People* v. *Scott,* 261 Ill. 165.) We are not able to say that the jury should have acquitted either of the defendants on account of the evidence given to establish an alibi raising a reasonable doubt as to his guilt.

Proof was permitted of the whereabouts of defendants on November 11 and 16, and it is contended this was reversible error, and the argument is that the purpose of such evidence was to show the defendants had committed other ' crimes than the one charged in the indictment. While that testimony had little or no relevancy to the issue being tried, we find nothing in that proof to remotely indicate the defendants had been guilty of other crimes. At most it only showed defendants were acquaintances and associates.

The widow of Weintraub, while testifying, was asked by the State's attorney if she had any children, and answered she had four. After she had answered, defendants' coun-

sel objected and moved that her answer be stricken, and the motion was sustained. In *Filippo* v. *People,* 224 Ill. 212, it was said such testimony was not essential to a fair trial of the accused, was not material or relevant, tended to prejudice defendant, and should not be admitted. The same ruling was made in *People* v. *McMahon,* 244 Ill. 45. The proof should not have been made, and presumably would not have been permitted had objection been made when the question was asked. Defendants' counsel objected after the answer was made and moved to strike it out, which motion was sustained by the court. We do not think the judgment should be reversed on that ground. *Simons* v. *People,* 150 Ill. 66.

Some other complaints are made of the rulings of the court on the admission of testimony, but the rulings were not of a material character and did not prejudice defendants.

The court gave on behalf of the People two instructions,—one of them covering about a page of the printed abstract,—defining a reasonable doubt, and it is contended this tended to frighten the jury against returning a verdict of not guilty. The instructions contained no statement that was not the law. We have frequently held it is not good practice to give a large number of instructions defining a reasonable doubt, for they might be understood by the jury as intended to give them to understand that the court feared the jury might think there was a reasonable doubt of defendant's guilt when there was none, and that elaborate discussion and definition of what constitutes a reasonable doubt is not illuminating but the reverse. While the long definition of what is a reasonable doubt which was given in one instruction in this case,—and the same instruction has been given in many others,—does not simplify the meaning of a term which is understood by every reasonably intelligent person, it affords no reasonable basis for reversing the judgment.

While the evidence as to whether defendants were the men who attempted to hold up the saloon and who shot Weintraub was conflicting, a reviewing court will not reverse a conviction on that ground. It was the province of the jury to determine the weight and credibility of the testimony of the witnesses, and, where the testimony is in irreconcilable conflict, to determine which of the witnesses is entitled to be believed. In such a state of the record a reviewing court will not reverse a conviction unless it can say there is a reasonable doubt, from the evidence, of defendant's guilt and that the verdict was the result of misapprehension or of passion and prejudice. We are of opinion this record does not present a case where a reviewing court should reverse the verdict and judgment.

The judgment is affirmed.           *Judgment affirmed.*

---

(No. 14367.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSEPH CHRISTY *et al.* Plaintiffs in Error.

*Opinion filed February 22, 1922—Rehearing denied April 7, 1922.*