(No. 20333.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ALFRED WILLIAMS, Plaintiff in Error.

*Opinion filed December 18, 1930.*

GERTRUDE G. HUITT, and KEEFE, BANDY & LISTEMAN, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, H. C. LINDAUER, State's Attorney, and MERRILL F. WEHMHOFF, (CURT C. LINDAUER, JOHN THOMAS, and CHARLES GRAY, of counsel,) for the People.

Mr. JUSTICE HEARD delivered the opinion of the court:

By this writ of error plaintiff in error, Alfred Williams, seeks a reversal of a judgment of his conviction, in the circuit court of St. Clair county, of the robbery of John Rust when armed with a dangerous weapon.

About three months prior to the alleged robbery the complaining witness, John Rust, a fisherman, rented a small shanty situated between the village of Cahokia and the Mississippi river, in St. Clair county, where he lived and fished in the neighboring waters. Some time prior to the occurrence in question, Rust's son, who lived with him, was arrested and fined $6.90 by police magistrate Earl West, who was jointly indicted in this case with plaintiff in error. On Labor Day, September 2, 1929, West, accompanied by plaintiff in error and Eddie Smith, drove from East St. Louis to Rust's shanty, and not finding him there drove down the road toward the Mississippi river, where they saw Rust fishing at a pond near the river. With Rust at this time was a colored man, Neff Young, who lived in St. Louis, Missouri, to whom Rust had just sold some fish for two dollars. Rust testified that plaintiff in error and West both stated that they were game wardens and asked him what he was doing; that he said he had sold Young two dollars' worth of fish, whereupon he was compelled to return the two dollars to Young, and West said, "I am going to take you now and arrest you;" that they also told him that they were revenue agents and had searched his house and found whisky there; that he admitted that there was whisky in his shanty and told them that if they were revenue agents they had a right to search the house; that they then compelled him to leave the place where he was fishing and return with them to the house, when a two-gallon jug and a quart-bottle of whisky were brought out of the house and placed on a table in the yard; that at this time West spoke to Rust about the unpaid fine of his son, and said, "If you are not going to pay this fine I am going to make you sweat;" that Rust went into the house and returned with a small pocket-book which contained about $4.30 and gave this to West, saying that he would pay the balance in the morning; that West insisted that the balance be paid then; that Rust went into the house and returned with about

$38 and some silver and paid the balance of the fine; that plaintiff in error was standing near West and Rust when Rust paid the balance of the fine from the $38; that plaintiff in error saw the money and took it out of Rust's hands; that Rust said, "What will I do now? I am broke;" that plaintiff in error said, "Would you sooner lose your money or your head?" that Rust said, "I would not like to lose either;" that they then said, "There is a still here;" that Rust said that he had nothing to do with it; that they sent West to town to get a truck to haul away the still; that before West left, a rifle worth $20 and a shot-gun worth $50 were taken and placed in West's machine; that Rust told them he wanted the guns to protect himself, but plaintiff in error said he was afraid to leave them there because he thought Rust would shoot them in the back; that Rust was to get the guns at West's; that after West left, another colored man came along and stopped and drank whisky with them; that plaintiff in error said the colored man was getting smart and pulled out his pistol and hit him on the head, and that Rust had not seen the pistol before but had rubbed against it in plaintiff in error's pocket. Rust is not corroborated by any other evidence tending to show plaintiff in error's guilt of the crime of robbery. West testified that he was at Rust's place about fifteen minutes, during which time he collected the sum of $6.90 in payment of a fine which he had imposed upon Rust's son; that they did not tell Rust that they were fish wardens; that he was not armed; that he knew nothing about a shot-gun and rifle that were taken away; that he did not see Smith or plaintiff in error take from Rust any fire-arms or money; that after Rust paid him the $6.90 Rust put in his pocket the balance of the money which he had; that they did not tell Rust they were prohibition agents or game wardens, and that he left before Smith and plaintiff in error. Plaintiff in error testified denying that any robbery took place there upon that occasion or that he took either fire-arms or money

from Rust. The uncontroverted evidence showed that both before and after Rust paid West the $6.90, plaintiff in error, Rust and Smith each drank a quantity of the whisky.

A resume of all the evidence as to the acts and words of the parties at the time in question leaves it an open question for the jury to determine whether the crime which was committed, if any, was extortion by threats, larceny from the person, or robbery, and it was therefore highly important that the record should contain no prejudicial error. On Rust's cross-examination he was asked by counsel for plaintiff in error if he drank any intoxicating liquor after he came up from fishing, to which an objection was made that it was not material. After the objection was sustained by the court counsel for defendant stated that he thought it was material, to which the court replied, "Don't make any difference whether he was drunk or not." The following colloquy then ensued:

Q. "What was your condition, as to your mind, at that time, after you got back from fishing and as you sat there?

Mr. Lindauer: "Object to that.

Q. "If you could remember details.

The court: "The question is whether he knows what was going on. He has testified under oath what was going on.

A. "Sure.

The court: "Objection sustained."

The condition of Rust's mind at the time of the alleged occurrence was highly important in determining whether the facts stated by him actually occurred or were the products of his imagination, caused by intoxication. The statement of the court that it made no difference whether he was drunk or not and that the witness had testified under oath to what was going on would naturally mislead the jury into believing that what Rust had testified under oath was what had actually occurred, and that whether or not he was drunk at the time of the occurrence should have no weight with the jury in considering Rust's testimony.

Laura Campbell was a witness who testified on behalf of plaintiff in error. In cross-examining her about her connection with plaintiff in error counsel for the State inquired of her if plaintiff in error and her son, Jimmie, had not been indicted together. While plaintiff in error's objection to this question was sustained by the court, its asking could have had no other purpose than to inject into the record and convey to the jury an improper impression which could not in any proper manner have been conveyed to the jury. In the case of *People* v. *Fiorita,* 339 Ill. 78, this court said, quoting from *People* v. *Beil,* 322 id. 434: "Where the State's attorney deliberately attempts to present to the jury matters which are improper, for the sole purpose of creating in the minds of the jurors an unwarranted prejudice against the defendant, justice requires, in a case where the proof of guilt is not clear, that a new trial should be granted."

The judgment of the circuit court of St. Clair county is reversed and the cause remanded.

*Reversed and remanded.*