(No. 21844.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GEORGE BLOCKBURGER, Plaintiff in Error.

*Opinion filed December 22, 1933.*

STONE, J., dissenting.

HAROLD J. BANDY, for plaintiff in error.

OTTO KERNER, Attorney General, LESTER GEERS, State's Attorney, and J. J. NEIGER, (LESLIE G. GEORGE, of counsel,) for the People.

Mr. JUSTICE SHAW delivered the opinion of the court:

This writ of error is sued out for the purpose of reviewing a judgment of the circuit court of Madison county, entered upon a verdict of a jury finding the plaintiff in

error guilty of the crime of statutory rape on Violet Stemler, a girl fifteen years of age, and sentencing him to the penitentiary for a period of eleven years. The case was tried once before in the circuit court of Madison county, resulting in a verdict of guilty and a sentence of ten years' imprisonment, which was set aside by the court and a new trial granted. The record does not show the reason for setting aside the first verdict.

The indictment charges the crime to have been committed on December 18, 1931, at which time the prosecuting witness was slightly under the age of fifteen years. The record shows that the plaintiff in error operated a book-making establishment and real estate office on the first floor of a store building in the heart of Granite City, on State street, directly opposite the Rialto Theater. The office faced west on State street, and the west or street side thereof was mostly of plate glass windows similar to those used as display windows in store rooms. This room was divided by a partition parallel with and about twelve feet from the street, which partition did not go entirely to the ceiling but was about five or six feet in height. At the north side of the partition was a swinging door or gate, the top of which was four or five feet from the floor and with an open space below it. The complaining witness described this as a "flopping" door. The front room contained a desk and chair, while the back room had some tables, chairs, a telephone, a cigarette-vending machine and a sofa or settee, the latter being, according to the complaining witness, up against the wall on the side of the swinging door. The premises had a back door leading into a small yard and thence into an alley. Plaintiff in error testified that this office had been lighted, unlocked and open to the public every evening until ten o'clock during the time in question, and this was not controverted.

Without any details, it is sufficient for our purpose to say that the complaining witness testified to several acts

of intercourse with the plaintiff in error between September and Christmas of the year 1931, all of them claimed to have taken place in the back room of the office above described. She told of having once visited the office of the plaintiff in error with an aunt of hers for the purpose of seeing about getting her uncle, and possibly also her step-father, out of the penitentiary, both of them being in that institution. This visit was prior to any of those later complained of. She testified, in substance, that on later visits she went to the office of the plaintiff in error by the alley and back entrance. On each of these occasions her sister, slightly older, accompanied her and was present during most of the conversation but did not stay in the room during the time when the intercourse was claimed to have taken place, and that sometimes the sister waited outside and sometimes in the outer office. She testified that each of these occurrences took place about twenty-five minutes to seven in the evening, the visits to the office being a day or two apart and the acts of intercourse being on alternate visits, stating that on the first and second visits there was no intercourse, that on the third there was, that on the next visit there was not, and so on, alternately, as to the various visits. She testified that on each occasion the plaintiff in error gave her two dollars and that she took the money home to her mother.

The defendant testified in his own behalf, denying all of the charges. He also produced the evidence of the doctor who had taken care of the sister of the complaining witness, who had been in the hospital under his care during part of the time the complaining witness claimed the sister had been accompanying her to the office of the plaintiff in error. The plaintiff in error also called the mother of the complaining witness, who denied that her daughter had ever brought her the sum of two dollars as testified to by the complaining witness, and denied ever sending her to the plaintiff in error's office for the purpose of having

sexual intercourse with him. He also called the sister of the complaining witness, who contradicted the testimony as to the trips to the office, denied that she was ever present when plaintiff in error asked her sister to have sexual intercourse with him and testified that she had never heard any such conversation. She also contradicted her sister's testimony as to having told her sister to go ahead and have intercourse with the plaintiff in error, and that she never saw him pay two dollars, or any other sum, to her sister and never knew of her receiving any money from him. She testified quite positively that she was never in the plaintiff in error's office but once, and that that was in the year 1932, when she went there with her mother.

In rebuttal the People recalled the sister of the complaining witness, who stated that she wanted to change her testimony, and then proceeded to testify that she was in the plaintiff in error's place of business with her sister in the night time in the months of November and December, 1931, and that she guessed it was five or six times; that the plaintiff in error took the complaining witness into the back room on each of those occasions; that the witness always went to the doctor, afterwards meeting her sister again; that they went in the front way, but that they went in the back way twice. She further testified that her sister had money on each of these occasions— sometimes two dollars—and that they took the money home and gave it to their mother. The mother was then recalled and stated that she wished to change her testimony. She proceeded to testify that her two daughters left home a couple of times that she knew of, to go to the plaintiff in error's office, and that the complaining witness brought money home to her a couple of times. On cross-examination she stated that all that day she had been in the State's attorney's office in the custody of a deputy sheriff and a police officer, who had talked to her, not by herself but always in the presence of her husband and two daughters;

that she was not promised anything if she would change her testimony and was not pressed but that she just decided to change the "wrong I made;" that her husband also talked to her; that the husband had previously been in the penitentiary. The record shows that he was then on parole.

This unusual situation in regard to the two witnesses, the mother and the sister of the prosecuting witness, was brought about as follows: The record shows they had been subpœnaed by the State and the defense, and that they appeared in court during the first day of the trial but were not present at the opening of court on the second day. Counsel for plaintiff in error thereupon filed a motion for a continuance on the ground of their absence, setting forth in the affidavit of continuance what he expected to prove by them. This affidavit was admitted by the State's attorney to the extent that the witnesses, if present, would testify as stated in the affidavit, and thereupon the motion for continuance was denied. Counsel for plaintiff in error caused an attachment to be issued for these two witnesses, upon which they were apprehended and brought into court and testified in the first instance as hereinabove stated. After giving their first testimony they apparently left the court room and tried to leave the State but came back when their truck broke down.

On cross-examination of plaintiff in error the State's attorney was permitted to go at great length into the reasons for these two witnesses failing to re-appear in court, the questions indicating, and being so framed as to be well calculated to convey to the jury the impression, that their absence had been procured by the plaintiff in error, although the record is entirely void of anything to show that this was the fact. The record does show that the plaintiff in error had procured an attachment and caused their arrest and forced them into court to testify for him. After they had given their first testimony and left, they were appar-

ently taken into custody by the State's attorney, or by some officers acting for him and under his direction, and kept in custody until they came back to the stand and in part recanted their previous testimony, as stated above.

Numerous errors are assigned on behalf of the plaintiff in error, it being contended that the cross-examination of the plaintiff in error and other witnesses was improper, inflammatory and prejudicial; that evidence was permitted to go to the jury tending to prove separate and distinct offenses other than the one covered by the indictment; that the weight of the evidence was insufficient for conviction, and that improper instructions were given. Without going into these alleged errors in detail or considering them separately, it must be pointed out that the case, on the whole, is such and the penalty imposed so severe as to make it essential that the record be free from prejudicial error.

It is claimed by the plaintiff in error that the penalty of eleven years' imprisonment imposed upon a man fifty-five, and now fifty-six, years of age, for all practical purposes amounts to a life sentence. It is argued that the transactions in question being purely commercial rather than seductive, it may be that the penalty was increased by inflammatory matters entirely regardless of the guilt or innocence of the defendant, and that since in this case the jury fixes the penalty, it is particularly important that the record should be free from anything calculated to arouse the passions of the jury or cause them to be unduly prejudiced. While it is not for us to fix the penalty in a case of this kind but is peculiarly a matter within the province of the jury, it is now, and long has been, the law in Illinois that in cases where the jury fix the penalty it is important that the record should be free from any attempt on the part of the State to present to the jury matters which are improper, for the sole purpose of creating in their minds a prejudice against the defendant. *People* v.

*Williams,* 342 Ill. 197; *People v. Fiorita,* 339 id. 78; *People v. Beil,* 322 id. 434; *People v. Thompson,* 341 id. 18.

In the cross-examination of Leota Mae Ely, the sister of the complaining witness, the following occurred, as shown by the abstract of record on pages 21 and 22:

A. "I will be 18 years old May 30. I am 17 now.

Q. "Isn't it a fact, Leota Mae, that your sister told your mother, in your presence, that she wasn't going to go to Blockburger's any more?

A. "No, sir.

Q "Isn't it a fact that you told your sister Violet, in the presence of your mother, that she, Violet, wasn't any better than you were, and that if you had to go she had to go?

A. "No, sir.

Mr. Bandy: "I object to that question and ask the jury be instructed to disregard it because it calls for a conversation between this witness and the complaining witness outside of the presence of the defendant.

The court: "You interrogated about the same conversation.

Mr. Bandy: "Only in the presence of the defendant. I did not ask for any conversation outside of the defendant's presence.

Mr. Geers: "I will withdraw it.

The court: "Objection sustained.

A. "I testified I was in Blockburger's office with my sister in September, October, November or December, 1931. I did not know that my sister was in his office or that she had been in it. She did not ever tell me she had been in the office.

Q. "Did she ever say to your mother, in your presence, or to you, that she wasn't going to go to Blockburger's any more?

A. "No, sir.

Q. "And didn't you say to her in your mother's presence or when your mother wasn't present—did you say to Violet, 'You are no better than I am—

A. "No, sir.

Q. —and if I have to go you ought to go?'

Mr. Bandy: "I object to that question.

The court: "Sustained, and the jury are instructed to disregard it.

A. "I never saw Violet give mother any money. I was in Blockburger's office only once. It was last year, 1932. I went there with my mother."

Pages 28 and 29 of the abstract of record show the following in connection with the cross-examination of the plaintiff in error:

A. "I am 55 years old. I was born in Illinois, at Carlinville. I lived in Carlinville until I was 17 and then I went to St. Louis. I was born in 1877. That would make it 1894 I went to St. Louis. I stayed in St. Louis fifteen or sixteen or seventeen years—something like that. I was there in 1901.

Q. "What was your name then? Was it George Scott?

A. "No—George Blockburger.

Q. "Did you ever go by the name of George Scott?

A. "No, sir.

Mr. Bandy: "I object to the question.

Mr. Geers: "I will hand him a document and ask him to look at it.

Mr. Bandy: "I want the court to pass on that.

The court: "Just step up here. [No ruling]

Q. "In 1900 were you in St. Louis or some place else in Missouri?

A. "I think I was in St. Louis. In 1900 I was in the spectacle business in St. Louis.

Q. "What were you doing in the month of April, 1900?

Mr. Bandy: "I object to this. It is immaterial, irrelevant and throws no light upon the issues in this case.

The court: "Objection sustained.

A. "When I came to Granite City I was in the liquor business until prohibition closed us up. Then I went into the real estate business. I was also signing a few bonds. That was about all I did. I am still in the real estate business. I have not signed any bonds for two years.

Q "What else have you been in, the last few years?

A. "I have been a commission bettor—taking bets on horse races. I wasn't exactly a 'bookie.' They placed bets with me and I bet them off. You might call it a booking place. I call it a commission bettor. We bet money on horse races.

Q. "How did they register those bets with you?

A. "I wouldn't register them. I would bet them off.

Mr. Bandy: "I object to details of the business. If he was running a book-making place he was running a book-making place.

The court: "Overruled."

Later in the further cross-examination of the plaintiff in error the following appears of record in connection with the absence of the two witnesses, the mother and sister of the complaining witness:

Q. "Did you tell them to leave there?

A. "Positively no.

Q. "You positively didn't do that?

A. "I certainly did not.

Q. "Did you tell Seitz to leave here?

A. "No, sir.

Q. "Did you tell Mrs. Hazel Stemler Seitz not to come to this court?

A. "No, sir.

Q. "Did you tell Leota Mae Ely not to come to this court?

A. "No, sir.

Q. "Did you tell any witnesses in this case not to come to this court?

A. "No, sir, I did not.

Q. "Did you give any persons besides Seitz money in respect to this case?

A. "Not that I know of.

Q. "But you would know it?

A. "Yes, certainly.

Q. "Well, did you?

A. "No, sir; absolutely not."

It is impossible to find any justification for the cross-examination of Leota May Ely quoted above. If it was intended to secure different answers than were secured it would be clearly incompetent as tending to show the commission of another crime—*i. e.*, the statutory rape of the complaining witness' sister, a year older than she. If not intended to elicit such answers it could have no effect other than to prejudice the jury and arouse their passions against the plaintiff in error. It is also further objectionable in that it calls for and did bring out certain conversations out of the presence of the defendant, who is the plaintiff in error here, which could not be competent. It is even more objectionable on this point for the reason that the questions were so framed as to contain the answers to them, thus giving the prosecutor the opportunity of testifying as well as asking questions. From it the jury could hardly help but get the clear inference that in the mind of the prosecutor, at least, the plaintiff in error had been guilty of acts of sexual intercourse with the complaining witness' sister, and that the matter had been talked over at some length in the home of the complaining witness between her mother, her sister and herself. It was prejudicial to the rights of the plaintiff in error and not calculated to accord him a fair trial.

The cross-examination of the plaintiff in error quoted above was likewise prejudicial to his rights. It conveyed to the jury the prosecutor's inference that the plaintiff in error had been engaged in some nefarious transaction in

St. Louis, or somewhere in Missouri, some thirty years previous to this trial, and that during that time he had gone by the name of George Scott. This is an inference, only, but a poisonous and dangerous one to draw against the plaintiff in error. It would not be material in this case if the plaintiff in error had been engaged in some unlawful transaction in Missouri some thirty years previously or if he at that time had gone by the name of George Scott. Neither was it material or necessary in this case to bring out and show that the plaintiff in error was at times engaged in the business of making bets on horses. Many of these questions were so asked as to make it difficult, if not impossible, for counsel for the plaintiff in error to preserve his rights through objections, as to object would be nearly as dangerous to the rights of the plaintiff in error as to adopt the only other course possible—that of appearing indifferent and allowing the matter to proceed. The same is true of the further cross-examination of the plaintiff in error indicating the opinion of the prosecutor that he had been guilty of causing the mother and sister of the complaining witness to leave the court. There was nothing in the record to even remotely indicate that the plaintiff in error had caused them to leave or been in any way connected with their leaving. In fact, the record shows that he had caused them to be arrested upon an attachment in order to secure their presence in court. When these errors are coupled with the dramatic return of these two witnesses later in the trial, and in part, and only in part, repudiating their former testimony, it is impossible to believe that the plaintiff in error had a fair trial or that the penalty imposed upon him was the result of a calm and unprejudiced consideration of the facts in the case. In the case of *Janzen* v. *People,* 159 Ill. 440, we quoted with approval the following quotation from Russell on Crimes, (vol. 2, p. 772,) as follows: "No evidence can be admitted which does not tend to prove or disprove

the issue joined. In criminal proceedings the necessity is stronger, if possible, than in civil, of strictly enforcing the rule that the evidence is to be confined to the point in issue. * * * It is therefore a general rule that the facts proved must be strictly relevant to the particular charge and have no reference to any conduct of the prisoner unconnected with such charge."

This court has repeatedly held that attempts to present matters before a jury which are not properly admissible in evidence, for the purpose of prejudicing the jury against the defendant, constitute prejudicial error. (*People* v. *Williams, supra; People* v. *Fiorita, supra; People* v. *Beil, supra; People* v. *King*, 276 Ill. 138; *People* v. *Brocamp*, 307 id. 448; *People* v. *Decker*, 310 id. 234; *People* v. *Lewis*, 313 id. 312; *People* v. *Garines*, 314 id. 413.) It is impossible for us to say on this record that the plaintiff in error was not prejudiced or injured by the matters hereinabove set forth, either upon the question of his guilt or innocence or upon the amount of punishment given him.

It appears from the record in this case that the only witnesses who in any way corroborate the testimony of the complaining witness are her mother and her older sister. Since each of these witnesses has admitted perjury and changed her testimony, it is doubtful what, if any, weight can be given to her testimony. We have repeatedly held that in cases of this kind, where the conviction depends upon the evidence of the prosecuting witness and the crime and its circumstances are denied *in toto* by the defendant, there should be some corroboration of the prosecuting witness. (*People* v. *Abbate*, 349 Ill. 147; *People* v. *Fitzgibbons*, 343 id. 69; *People* v. *Glasser*, 335 id. 263; *People* v. *Blanch*, 309 id. 426; *People* v. *Dameron*, 346 id. 408; *People* v. *Bolik*, 241 id. 394; *Stevens* v. *People*, 158 id. 111.) It is contended that the complaining witness was corroborated in her testimony, in that she ap-

parently knew and was able to give a fairly accurate description of the inner office of the plaintiff in error. It is also apparent, however, that this case had been tried once before, and that the complaining witness may have obtained her knowledge of the office from incidents at that trial and the description then given. It is not for us to say to what extent this may be a corroboration of her testimony, but it certainly is not the corroboration of any witness. Her own testimony is greatly confused as to dates and is far from being entirely satisfactory in other ways. Upon the whole record we are convinced that justice requires the granting of a new trial.

It is therefore ordered that the judgment of the circuit court of Madison county be reversed and the cause remanded to that court. *Reversed and remanded.*

Mr. JUSTICE STONE, dissenting.