**People of the State of Illinois, Plaintiff-Appellee, v. Fred Oparka, Defendant-Appellant.**

**Gen. No. 51,783.**

First District, Second Division.

June 30, 1967.

Lee A. Levin, of Chicago, for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Morton E. Friedman, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

At a jury trial defendant, Fred Oparka, and his brother, William Oparka, were found guilty of the crime of rape and were each sentenced to 60 years in the Illinois State Penitentiary. Fred Oparka prosecutes this appeal wherein he maintains that the evidence was insufficient to establish his guilt beyond a reasonable doubt and, secondly, that certain conduct and remarks of the prosecuting attorney during final argument misled and confused the jury, prejudicing defendant and depriving him of a fair and impartial trial.

On June 12, 1959, at approximately 10:45 p. m., Joyce Ray, the prosecuting witness, was seated in a parked car with Mr. Louis Iavarone, in the 9200 block of South Yates Avenue in Chicago. Miss Ray at that time was a student nurse at the South Chicago Hospital and resided

in the nurses' quarters one-half block from where the car was parked. Two men, later identified by Miss Ray as defendant and his brother, approached the Iavarone automobile, William Oparka approaching from the driver's side carrying a gun and defendant approaching from the passenger side. Iavarone was ordered into the back seat of the automobile and told to keep down and keep quiet. The Oparka brothers entered the front seat and forced Miss Ray to sit between them. With defendant holding the gun on Miss Ray and Iavarone, William Oparka drove the automobile across 93rd Street to a secluded place on 94th Street between Paxton and Merrill Avenues. William Oparka entered the back seat of the automobile, took a small brown bottle containing either chloroform or ether, poured some of its contents over a handkerchief which he requested and received from Iavarone and rendered Iavarone unconscious. Defendant then proceeded to rip the clothes off Miss Ray and, as both men hit and choked her, defendant had sexual intercourse with her. The two men then changed places in the automobile and William Oparka had sexual intercourse with Miss Ray. During the course of both acts, one or the other of the men held the pistol on Miss Ray. She struggled with the two men and succeeded in kicking the automobile door open several times but it was finally closed and locked.

After the rape the two men bound and gagged Miss Ray with her torn clothing and attempted to use the chloroform or ether on her, but she caused the contents of the bottle to spill on the front seat of the automobile. The men then wiped the inside of the automobile with Miss Ray's torn clothing, disconnected the horn and left, stating to Miss Ray that they had Iavarone's wallet and that they would "get him" if she told anyone of what had occurred. After they left Miss Ray succeeded in removing the gag from her mouth and awakened Iavarone who untied her hands. Miss Ray then went to the nearest

house, about a block from the scene, where she made complaint. Iavarone was still feeling the effects of the chloroform or ether and had to be helped to the house. The police were summoned and both Miss Ray and Iavarone were taken to the hospital for treatment.

At the hospital Miss Ray was examined by Dr. Weiss, who testified that he observed a large bruise and redness on the back of her neck. He also observed fresh blood coming from a tear in her hymen membrane and stated that the tear occurred within 24 hours of the time he treated her. A smear test was performed which revealed the presence of blood and sperm. The doctor stated that Miss Ray was also treated for "marked nervousness."

A Chicago police officer testified that he retrieved Miss Ray's torn clothing from the automobile where the incident had occurred and further that he noticed a "medicinal odor" in the automobile which he identified as being chloroform or ether.

Miss Ray testified that she gave a description of the two men to the police. She stated she was unable to see them very well when they first confronted her and Iavarone on Yates Avenue due to poor lighting conditions on the street, but that she could see them plainly when the automobile was being driven across 93rd Street, a busy thoroughfare, to 94th Street between Paxton and Merrill Avenues, due to the lights of oncoming traffic and the Iavarone automobile's dashboard lights. Iavarone testified he was unable to identify either of the defendants as being the men who confronted him and Miss Ray because he was ordered to keep down in the automobile, the result of which he was unable to see the men's faces and after which he was rendered unconscious.

On August 11, 1959, Sergeant John Glas of the Sex Division of the Detective Bureau stopped defendant in an automobile on an unrelated matter in the vicinity of 103rd and Torrence Avenue, a short distance from where Miss Ray had been raped. The officer noticed that defend-

36

ant matched the description of one of the men who accosted Miss Ray. The automobile, which belonged to William Oparka, was searched and the officer recovered a loaded Luger pistol in the glove compartment, a loaded shotgun in the trunk and numerous shells laying on the front seat of the automobile. The Luger pistol was identified by Miss Ray at the trial as the gun which was held on her during the rapes. Defendant was arrested and taken to the 8th District Police Station where he was shown in a police lineup with five or six other men on the following morning. Miss Ray viewed the lineup and stated that she thought defendant was one of the men who raped her, but that she was confused and wanted to be certain and that she wanted to have a little time to think it over. Miss Ray viewed a second lineup later that day at 11th and State Streets and positively identified defendant as one of the men who raped her. Miss Ray stated that her confusion at the first lineup was occasioned by the very bright lights shining on the men in the lineup, that she had seen defendant in dimmer lighting on the night of the rape, and that the lighting at the lineup at 11th and State Streets was much closer to the lighting on the night of the rapes, enabling her to make her positive identification of defendant.

William Oparka was arrested at his place of employment, The Applied Immunology Laboratory, later that day and was taken to the Sex Bureau at 26th and California Avenue, shown in a lineup which included defendant, and was identified by Miss Ray as one of the men who accosted her. At the time of William Oparka's arrest, he asked the arresting police officer, "Are you out here to arrest me for the rape of that girl on the south side?" The arresting officer testified that prior to this statement he did not inform William Oparka of the nature of his business.

Mildred Peters, a registered nurse and a fellow employee of William Oparka, testified that Oparka showed

her a nurse's wristwatch sometime during the week of August 5, 1959, and that Oparka said that he found it in the ashtray of his automobile. The jury was instructed that anything said by William Oparka outside the presence of the defendant was to be considered only as to William Oparka and not as to defendant. Mrs. Peters further testified that there was a supply of ether at the laboratory where Oparka worked and that it was kept in an unlocked cabinet and was easily accessible to employees. The trial court refused to allow into evidence a small brown bottle which was allegedly similar to the type used in the laboratory where Oparka worked and allegedly similar to the one used by him on the night of the rapes.

Buss West testified on behalf of defendants and stated he was a bartender in a tavern in the 5700 block of Indiana Avenue in Chicago. He testified that William Oparka frequented the tavern and that he remembered Oparka being in the tavern on the night in question until closing time, after which he and Oparka went out for breakfast. He stated that William Oparka never left his presence until approximately 4:30 a. m. the following morning.

Shelby Landini, a friend of defendant's sister, testified for the defense that she talked to Miss Ray in a bowling alley after July 12th and that Miss Ray told her she was connected with the Oparka case. Mrs. Landini testified that she asked Miss Ray if Miss Ray could identify "the boys" and that Miss Ray replied that she could not because of the fact that it was dark. Gerald Sajeak, another defense witness, testified that he and defendant were in the Escape Tavern at 107th and Torrence Avenue on the night of the rapes.

Defendant's first point, that the evidence fails to show him guilty beyond all reasonable doubt, is based primarily on the position that Miss Ray had little opportunity

to observe her assailants and that she failed to give a positive identification of them.

The question of the accuracy of a description given by a witness connecting a defendant with a crime and the weight to be given thereto are matters to be determined by the trier of fact, and a reviewing court will not interfere with the determination unless it is clearly or manifestly erroneous. A positive identification given by a single witness, where credible, will be sufficient to justify a finding of guilty. People v. Boney, 28 Ill2d 505, 192 NE2d 920. Miss Ray had ample time and opportunity to observe both of her assailants. Although she stated she did not get a good look at them when they first confronted her and Iavarone due to the poor lighting conditions on the street, she sat next to both men and did have adequate opportunity and light to observe their physical and facial features from the time they drove from 92nd and Yates until the men left the scene after the rapes. We are unable to say that the jury could not have found Miss Ray to have had ample time and opportunity to adequately observe her assailants.

Secondly, the descriptions given to the police by Miss Ray conform almost precisely with the physical makeup of both Oparkas. William Oparka was described to the police as being 5 feet 9 to 5 feet 11 inches tall, 160 to 170 pounds, short brown hair worn in a crew cut and a pockmarked face. Defendant was described as 5 feet 9 to 5 feet 11 inches tall, 150 to 180 pounds, brown or dark blonde hair with a reddish cast which was darker than William Oparka's hair and heavily pockmarked face. The only difference between the descriptions given by Miss Ray and the actual physical makeup of the Oparkas was the shade of the hair color, a triviality when considered in view of the dimly lit environment in which Miss Ray first observed the men. Minor imper-

fections in an identification does not render the identification invalid and the existence of such imperfections is a matter for the jury. People v. Davis, 70 Ill App2d 419, 218 NE2d 3.

Defendant's attack on the identification of defendant by Miss Ray is likewise groundless. He claims that Miss Ray's hesitation in identifying defendant at the first police lineup indicates that she was uncertain defendant was one of her assailants. However, Miss Ray explained at the trial that the reason why she was confused at the first lineup was due to the bright lights shining on the men in the lineup. When she viewed defendant later at a more dimly lit lineup, the lighting more closely conforming to the environment in which she observed her assailants, Miss Ray made a positive identification of defendant.

██ Defendant cites several cases in support of his position that the evidence failed to prove him guilty beyond a reasonable doubt. In People v. Ricili, 400 Ill 309, 79 NE2d 509, the prosecuting witness stated at the time she first saw defendant in the lineup that she was not certain he was her assailant and that she wanted to take a better look; this fact, in addition to several other matters casting doubt upon her identification of defendant as her assailant, prompted the court to hold defendant's identity as the assailant not proven beyond a reasonable doubt. In People v. Fiorita, 339 Ill 78, 170 NE 690, nine people were eyewitnesses to a killing which occurred so quickly that most of the nine were confused as to the identification of the defendant as one of the killers; many of the witnesses related different stories of the occurrence at the time of trial. In People v. Cullotta, 32 Ill2d 502, 207 NE2d 444, the only evidence connecting defendant with the burglary for which he was being tried was the testimony of two police officers who had observed the defendant in a laundromat while cruising in their squad car some four hours and again some two

hours prior to the time they observed the burglary in progress in the laundromat; the reviewing court held that because it was snowing at the time, because the officers' observations of defendant prior to the burglary were fleeting, and because defendant was not found inside the laundromat at the time of the burglary, defendant's identification as one of the burglars was not established beyond all reasonable doubt. These cases are clearly distinguishable from the situation in the case at bar, in that Miss Ray had ample time and opportunity to observe both of her assailants while traveling to the location where the rapes occurred and also during the time that the rapes were occurring.

■ ■ Defendant's second contention is that the prosecuting attorney raised certain improper matters during final argument which prejudiced the jury against defendant and deprived him of a fair trial. The first point most strongly urged by defendant is that the prosecuting attorney argued that the nurse's wristwatch taken from Miss Ray on the night in question, which was shown by William Oparka to Mrs. Peters a few weeks later, was corroborative of the rape and connected William Oparka with the incident, whereas the record is devoid of any evidence that Miss Ray's watch was taken on the night in question. While it is true the record does not contain evidence that a wristwatch was taken from Miss Ray, it appears that the trial judge, the prosecuting attorney and the defense attorney all assumed the fact to have been in evidence. Nonetheless, the prosecuting attorney attempted to use the matter of the wristwatch as corroborative of the fact that the Oparka brothers were involved in the rapes. The evidence was merely cumulative and did not constitute an integral or material link in the chain of guilt. Where the evidence shows a defendant guilty beyond all reasonable doubt the verdict of a jury will not be set aside where a different verdict would not have been reached had no er-

41

ror intervened. People v. Baker, 365 Ill 328, 334, 6 NE2d 665. While it was error for the prosecuting attorney to have argued the matter of the wristwatch to the jury, this was in no way prejudicial to the defendant in view of the other, substantial, evidence of guilt in the record. The case of People v. Blockburger, 354 Ill 301, 188 NE 440, cited by defendant in support of this position is not in point. The questions asked by the prosecuting attorney in that case related to similar acts performed by the defendant with the sister of the complaining witness as well as questions relating to defendant's activities some 30 years prior to the trial. Those lines of questioning were clearly prejudicial to the defendant, unlike the situation in the case at bar.

Defendant points to another matter raised by the prosecuting attorney in closing argument as being improper which was a comment to the effect that it would be a long time before Miss Ray recovered from the shock to her nervous system resulting from the rapes, whereas no evidence to this effect was adduced at trial. While there is evidence that Miss Ray was suffering from "marked nervousness" and was "very hysterical" after the incident, this matter falls into the same category as the comments made in closing argument concerning the nurse's wristwatch. Defendant cites People v. Egan, 331 Ill 489, 163 NE 357, as standing for the proposition that it is improper to introduce evidence of the condition of the prosecuting witness at the time of trial. The Egan case is not in point for the reason that the evidence was close on the question of guilt; such evidence could easily have swayed the jury and was therefore held to be improper.

The other contentions advanced by defendant concerning remarks made by the prosecuting attorney in closing argument are baseless. First, it was not improper for counsel to characterize defendants as "savages" in view of the evidence of their overall behavior on

42

the night of the rapes. People v. Burnett, 27 Ill2d 510, 190 NE2d 338. Secondly, it may be properly inferred from the evidence that Miss Ray was a virgin before the rapes. Dr. Weiss testified that there was fresh bleeding coming from the tear in Miss Ray's hymen membrane, which tear occurred within 24 hours of his examination of Miss Ray. The prosecuting attorney, furthermore, did not misstate the evidence when he referred to the rape of a "17- or 18-year-old girl" in view of the evidence that Miss Ray was 18 years old at the time of the rape, although she was 19 years old at the time of trial. Finally the prosecuting attorney did not argue, as defendant maintains, that defendant should have testified in his own behalf. Defendant attaches innuendo to the prosecuting attorney's remarks which is uncalled for when viewed in the context of the argument.

The remaining points raised by defendant have been considered and are found to be without merit.

The judgment is affirmed.

Judgment affirmed.

LYONS, P. J. and BRYANT, J., concur.