(No. 19996.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CARL FIORITA, Plaintiff in Error.

*Opinion filed February 21, 1930—Rehearing denied April 4, 1930.*

KEEFE, BANDY & LISTEMAN, for plaintiff in error.

Oscar E. Carlstrom, Attorney General, and Alvin C. Bohn, State's Attorney, (M. L. Welch, and Emery J. Smith, of counsel,) for the People.

Mr. Justice Samuell delivered the opinion of the court:

March 16, 1928, Elmer Baltz, cashier of the First National Bank at Madison, Illinois, was shot and killed by robbers while conveying a package of money from the Madison post-office to the bank. Elmer Etzel and plaintiff in error, Carl Fiorita, were jointly indicted by the grand jury at the May term, 1928, of the circuit court of Madison county. The defendants were tried and found guilty at the October term, 1928, and sentenced to serve a term of fifty years in the Southern Illinois penitentiary. Plaintiff in error, Fiorita, prosecutes this writ of error to review that judgment.

Madison avenue in Madison runs north and south. The bank is at the northwest corner of Fourth street and Madison avenue, facing the latter street. One block south, at the southwest corner of Third and Madison, is Glick's department store, and about one-half block further south on Madison avenue, between Third street and Second street, is the post-office. About 9:30 on the morning of March 16, 1928, Elmer Baltz, cashier, accompanied by Frank Smith, a private guard for the First National Bank, left the bank in Baltz's automobile and drove south on Madison avenue for the purpose of obtaining a registered package of money shipped to the bank by the Federal Reserve Bank of St. Louis. Their car was parked at the curb on the west side of Madison avenue, directly in front of the post-office, and both got out and went into the post-office. Near ten o'clock the postmaster delivered the package to Baltz. Baltz and Smith re-entered the car and proceeded south to the intersection of Madison avenue and Second street, made

a U-turn and proceeded north on the east side of Madison avenue. Baltz was driving. They had traveled about a quarter of a block when four men in a Buick sedan automobile, which had been standing in front of Glick's store, drove diagonally across the street in a southeasterly direction, directly in the path of Baltz's car, compelling the latter to stop. The bumpers of the cars clashed. The evidence is not clear as to whether one man or two or three or four men got out of the Buick car. Revolvers were drawn. Baltz stepped out of the left side of his car, raised his hands and cried, "Don't shoot!" Thereupon Smith fired, and then a fusillade of shots came from the robbers' guns. Baltz was fatally wounded, and Smith, who was badly injured, ran up an alley. The robbers' car was driven north on Madison avenue and disappeared. About five weeks later, on April 23, plaintiff in error was arrested in room 7 on the second floor of the Fairmont Hotel, in Collinsville, about ten or eleven miles distant from Madison. Joe Nessor was with him. A .38-caliber Colt revolver loaded with six cartridges was found in the dresser drawer in the room. Nessor had engaged the room and registered as "Joe Carco." The register shows "Ralph Beasley and party" were registered at the hotel on March 14 and 15 and "Ralph Beasley" on March 16 and 17. Fiorita was generally known among the hotel employees as Ralph Beasley. On April 22 and 23 Fiorita was a guest at the hotel, being there with Nessor, who registered as Joe Carco.

In further support of the People's case the following witnesses testified substantially as follows:

Grace Wining, a saleslady at Glick's store, stood at the entrance of the store on Madison avenue and saw a Buick car parked at the curb on the west side, in front of the store entrance, about 9:30 on the morning of March 16. The car contained four men and was parked there for at least twenty minutes. She glanced at the occupants casually. She saw a car approach from the south and the

Buick go diagonally across the street and saw the two cars meet on the east side of Madison avenue. A man in the Buick jumped out and began shooting. After the shooting the Buick car backed and then went north. She testified she thought Fiorita was one of the four men who sat in the automobile in front of Glick's store on that morning, or at least it was somebody who looked like him. She testified that she had never seen him before or after that time until she saw him in the St. Louis police station a day or two later. She was recalled to the witness stand later and testified that after she had talked with the State's attorney she wished to correct a mistake in her testimony; that she never saw Fiorita in the St. Louis police station but had seen him in the Madison police station after his arrest in April. She could not identify Etzel.

Frank Smith, the guard, described the circumstances of the shooting but could not identify plaintiff in error or any of the robbers.

Catherine Leyden, a saleslady at Glick's, saw the Buick sedan parked near the entrance of the store between nine and ten o'clock that morning. She testified that it stood there about twenty minutes; that there were four men in the car, all well dressed, with light, tannish overcoats and hats to match; that Fiorita looked like one of the men; that she saw the Buick go diagonally across the street; that she saw four men standing in the street with light overcoats on and guns in their hands and that all were shooting. She testified that she believed one of the four men looked like one of the defendants.

John Mowery testified that he had lived in Madison sixteen years; that he did grading and contract work and that he frequently estimated measurements; that at the time of the shooting he was standing at the end of Glick's store and that the shooting took place directly across the street; that the machines came together about 200 feet south of him; that Madison avenue is about 30 feet wide

from curb to curb; that it might be nearer 60 feet wide than 30 feet; that Madison avenue is a wide street and a double street railway track runs down the center, and that on each side of the track there is a space of at least ten feet, with ample room for two automobiles to pass; that when the automobiles came together three men got out of the Buick and began shooting and he saw Baltz raise his hands, and that they were facing Baltz as they shot; that he recognized Fiorita and Etzel as two of the four men in the Buick; that the whole thing came as a surprise to him and that he stood there in a dazed condition for some little time afterwards; that he did not remember how they were dressed; that he thought the shooting took place in Gibson county but that he really did not know.

Nellie Hood at the time of the robbery was on the west side of Madison avenue, near the post-office. She saw the Buick car as it came south and stopped at the east curb. She saw one man get out of the car and shoot Baltz. The other three men stayed in the car. She did not identify Fiorita.

John Vaught was on the west side of Madison street, almost directly across from the scene of the shooting. He saw the cars collide. He described the Buick as a greenish, large car, while other witnesses describe it as blue. He says only one man got out of the Buick and that he had a shotgun, but that man did no shooting. He could not identify any of the robbers. He saw the license plate on the green car, which reminded him of having seen the plate before and also the car; that on March 9 he and a policeman put the license number on a slip of paper, which he identified; that the number on the identified slip was 347958.

Joe Shando, a street cleaner in Madison, testified that on March 9 he saw Fiorita walking on the sidewalk at Third street and Madison avenue, and that a fat fellow was sitting in a green Buick car and that Fiorita got in the car and drove away; that he remembered the license

number as being 347958, and that he turned in the number to the police station.

Xavier Berlesman, of Belleville, testified that he owned an Essex car in 1928; that his license plate was stolen from his car the night of February 24, 1928, and that the number of the plate was 347958.

Sheriff Robert Lyons testified that when Fiorita was arrested he said his name was Ed Beasley.

Police officer Odum testified that it would take thirty or thirty-five minutes to drive from the Fairmont Hotel at Collinsville to Third street and Madison avenue in Madison at the rate of thirty-five miles an hour.

William Liner, a witness for the People, testified that he was the day clerk at the Fairmont Hotel on March 16; that he knew Fiorita and also knew that Fiorita stayed at the hotel on the night of the 15th; that he saw Fiorita and Nessor in the hotel on the morning of the 16th, and that they left the hotel between ten and eleven o'clock.

Thereupon Thomas M. Lewis was placed on the stand as an expert witness in bullet inspection, commonly known as internal ballistics. He testified that he had been employed by the St. Louis police department since February, 1927; that for a few months preceding the date of the trial he had been the microscopic photographer and bullet examiner for the department; that his work consisted of identifying bullets as having been fired from certain weapons; that the work is done with a twin microscope with a single eye-piece; that he has been a photographer for fifteen or twenty years and at one time ran a shooting gallery and penny arcade; that this was his only experience with fire-arms until he became connected with the police department; that he had never been to or worked in a factory where guns were manufactured; that he thought the factory of the Colt company was at Hartford, Connecticut, but was not sure; that he did not know how guns looked when they first came from the machines; that he

did not positively know whether the markings were the same on each particular gun when they first came from the factory, although he had read considerable about Colt specifications; that he had never attended a school or college where the subject of ballistics is taught. The court, over the objection of plaintiff in error, permitted the witness to testify as an expert. He stated that by examining a bullet fired through a revolver he could tell the kind of revolver that propelled the bullet; that each revolver would make grooves and bands on a bullet which would have distinctive markings; that he had fired a test bullet through the gun introduced in evidence, marked Exhibit 3, being the gun taken from Nessor's and Fiorita's hotel room, and that by comparison and examination of both bullets he was of the opinion that the bullet found in the body of Baltz was fired from Exhibit 3. The testimony of the witness was very extensive and elaborate, but we consider it unnecessary to recite further details because of our conviction that the witness did not possess sufficient knowledge or experience to qualify him as a ballistic expert.

For the defense, Tom Harris, of Madison, testified that on the morning of the shooting he was on the east side of Madison avenue; that two cars came together near the curb and the bumper of one of them almost touched his crutch. Two of the four men got out of the Buick car. He was only a few feet away and saw the shooting. One of the men who got out of the car was of about the same height as plaintiff in error but was much heavier. He did not believe plaintiff in error was one of the four robbers, although one of the men had a Colt gun.

Joseph Nessor testified that he met Fiorita at the Newstead Theater, in St. Louis, about nine o'clock in the evening of March 15 and that they left there about eleven o'clock, and, after eating dinner, arrived at the Fairmont Hotel, in Collinsville, at about two o'clock on the morning of the 16th; that Fiorita registered as Ralph Beasley; that

they slept in the same bed that night and both got up about 10:30 or 11:00 o'clock on the morning of the 16th; that they then went to a barber shop in Collinsville and left for St. Louis between 12:30 and 1:00 o'clock; that he is a light sleeper and would have known if Fiorita had gotten up; that he had been to the hotel previously with Fiorita and was with him when arrested; that he is a car salesman; that he had a Hudson car and Fiorita had a Buick coupe.

Plaintiff in error testified in his own behalf. He denied that he had participated in the robbery or murder or that he was in Madison on March 16, 1928. On cross-examination he testified that although he lived in Missouri he had bought an Illinois license for his car, giving his residence as Granite City, thereby saving $12. He confirmed, on direct examination, Nessor's testimony as to his whereabouts and movements on the evening of March 15 and the morning of the 16th; that he used the name of Beasley as a joking matter; that he was the manager of one of his father's theaters in St. Louis.

It is urged on behalf of plaintiff in error that the People failed to prove his guilt beyond a reasonable doubt, and in support of this contention it is argued that plaintiff in error was not sufficiently identified. It is the well established law of this State that the burden rests upon the People not only to prove the commission of the crime beyond a reasonable doubt but also to prove by the same measure of evidence that it was committed by the person or persons accused, and a conviction cannot be said to be sustained by the evidence beyond a reasonable doubt where the testimony of the witnesses shows that their identification of the defendant was doubtful, vague and uncertain. (*People* v. *O'Hara*, 332 Ill. 436.) The conviction of plaintiff in error in this case rests upon the identification of three witnesses, two of whom merely testified that plaintiff in error looked like one of the men in the Buick car.

Mowery, the only witness who made a positive identification, was standing more than 200 feet from the scene of the shooting. The robbers, facing Baltz, of necessity had their backs toward the witness all or a greater part of the time. The entire affray took but two or three minutes, and the witness had never seen any of the men before that time. The identification of one stranger by another is generally a matter of opinion and belief. The circumstances leading up to such identification must therefore be susceptible of reason and probability. Mowery was unable to give even a general description of how the men were dressed. He testified that the shooting came as a surprise to him, and that he remained where he was, in a dazed condition, for some time after the robbers had gone. Although he purported to make a positive identification of plaintiff in error, it is obvious that his opportunity for observation was very limited, and, in view of his uncertainty and vagueness as to other matters about which he attempted to testify, we think his identification is not entitled to great weight—at least it is not convincing beyond a reasonable doubt.

As against the identification by the above three witnesses, William Liner, a witness who was called and testified on behalf of the People, testified that plaintiff in error did not leave the hotel at Collinsville until between ten and eleven o'clock on the morning of the murder. Harry Odum, a police officer, also a witness for the People, testified that it would take from thirty to thirty-five minutes to drive from Collinsville to Madison at the rate of about thirty-five miles an hour. If these witnesses are to be believed it is apparent that plaintiff in error could not have participated in the commission of the crime. The undisputed evidence is that the crime occurred a very few minutes after ten o'clock and was committed by four men who had been in Madison for at least a half hour prior to its commission. We think, on the evidence introduced on be-

half of the People alone, there was grave doubt as to the guilt of plaintiff in error.

Over objection of counsel for plaintiff in error, the witness Joe Shando was permitted to testify that he had seen plaintiff in error at Third street and Madison avenue, in Madison, on March 9, a week prior to the murder of Baltz, and had seen him enter a green Buick car bearing the license number 347958. This testimony had no relevancy upon the question as to whether or not plaintiff in error was in Madison at the time Baltz was murdered and should not have been admitted. The only inference which the jury could draw from this testimony was that, since plaintiff in error was in the car a week before, he had something to do with the robbery and murder. It was therefore prejudicial to his rights.

Complaint is also made that the State's attorney was permitted too much latitude in his cross-examination of Joseph Nessor, a witness for plaintiff in error, and in his cross-examination of plaintiff in error. In the cross-examination of Nessor the following questions were asked and answers given, over objections of counsel for Fiorita:

Q. "What is the license number on your car?

A. "I don't know.

Q. "Have you a receipt for it from the Secretary of State?

A. "I have title to the car where I bought it.

Q. "I want the receipt from the Secretary of State. Did you apply to the Secretary of State for a license for your car?

A. "Yes, sir. Not on this Hudson. I had a Nash, and when I traded my Nash in on a down payment on this Hudson car, the company I traded my Nash asked me for a three-dollar exchange fee, and they changed the license onto the Hudson coupe. I gave them three dollars and they had the license changed onto the Hudson coupe.

Q. "So you had a Missouri license on the first car and transferred it to the other car?

A. "Absolutely.

Q. "What kind of license?

A. "Missouri license.

Q. "This is a Missouri license?

A. "Yes, sir."

It is not claimed that the questions or answers had anything to do with the crime or were asked in pursuance of anything brought out on direct examination, but it is argued they were proper for the purpose of testing the credibility of the witness. Whatever may have been the purpose of this line of questioning, it was improper for the reason that it tended to prejudice the witness in the minds of the jury by innuendo and insinuation. (*People* v. *Decker,* 310 Ill. 234; *People* v. *Johnson,* 314 id. 486.) Such questioning inferred that there was something irregular in Nessor's ownership of the car. It was not proper cross-examination and should not have been permitted.

It was also error to allow the State's attorney to cross-examine Fiorita at length on the collateral and immaterial subject of his application for an Illinois license for his automobile, which it was not claimed was used in connection with the commission of the crime. (*People* v. *Beil,* 322 Ill. 434.) In that case we said: "The matters about which the inquiries were made had no connection with or relation to the offense charged and were foreign to the direct examination. Where the State's attorney deliberately attempts to present to the jury matters which are improper, for the sole purpose of creating in the minds of the jurors an unwarranted prejudice against the defendant, justice requires, in a case where the proof of guilt is not clear, that a new trial should be granted."

It is next urged that it was error to allow the witness Thomas M. Lewis to testify regarding the gun found in Nessor's and Fiorita's hotel room and the bullet taken from

the body of the deceased. While the science of ballistics is now a well recognized science both in this country and abroad, testimony based upon it should be admitted with the greatest care. No witness should be permitted to testify regarding the identification of fire-arms and bullets by the use of this science unless the witness has clearly shown that he is qualified to give such testimony. In this case Lewis testified that he had been employed by the St. Louis police department and had been engaged in the identification of guns for several months; that he had never been to an arms manufacturing plant or seen guns in the process of manufacture; that he had never seen the tools with which the rifling is done; that he did not know how a gun looked when it first came from the machine; that his experience covered the examination of about 150 bullets. He made no attempt to state what educational qualifications he possessed, nor did he show that he had studied the works of recognized authorities in this science. He admitted, on cross-examination, that he had never attended any school or college where the science of ballistics is taught. The question of the qualification of an expert witness rests largely in the discretion of the trial court, and the test of qualification is necessarily a relative one, depending upon the subject under investigation and the fitness of the particular witness. (*Mahlstedt* v. *Ideal Lighting Co.* 271 Ill. 154.) Where previous study is essential to the formation of an opinion sought to be put in evidence, only such persons are competent to testify as experts as have by experience, special learning and training gained a knowledge of the subject matter upon which an opinion is to be given, superior to that of an ordinary person. (*City of Chicago* v. *McNally*, 227 Ill. 14.) The experience and training of the witness Lewis in this case, as shown by his testimony, were far from sufficient to qualify him as an expert, and it was an abuse of discretion for the trial court to admit his testimony.

This case is not one for the application of the rule that where the defendant is clearly guilty and no other verdict could reasonably have been returned by the jury the judgment will not be reversed for errors upon the trial. The jury might very properly have found plaintiff in error not guilty if the witnesses Shando and Lewis had not been permitted to testify and the cross-examination of Nessor and plaintiff in error had been properly limited.

The judgment of the circuit court is reversed and the cause remanded.

*Reversed and remanded.*