(No. 42805.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. IVORY HUBBARD, Appellant.

*Opinion filed October 1, 1973.*

EDWARD M. GENSON, of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and BERNARD CAREY, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and KENNETH L. GILLIS and JONATHAN B. GILBERT, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE DAVIS delivered the opinion of the court:

The defendant, Ivory Hubbard, was tried and found guilty by a jury in the circuit court of Cook County of the offenses of murder and armed robbery of Stephen E. Granzyk. The defendant's trial was severed from that of his co-defendants, Andrew Brooks and Celester Jones, who were tried and convicted of the same offenses earlier. We affirmed their convictions in *People v. Brooks (1972), 51 Ill.2d 156,* and the facts concerning those offenses were adequately stated in that opinion and we do not deem it necessary to repeat them here, except insofar as necessary to depict the issues raised by this defendant.

In his appeal, the defendant Hubbard contends: (1) that the proof was insufficient to support a finding that he was guilty as a principal in the murder of which he was accused; (2) that the trial judge committed error by restricting the cross-examination of the principal State's witness; (3) that the defendant was denied a fair trial as a consequence of the trial judge's comments before the jury; and (4) that the defendant's constitutional rights were violated when his oral and written statements were admitted in evidence.

Between 8 and 9 P.M., on November 20, 1967, five boys, Jones, Brooks, the defendant Hubbard, Williams, and Hart, were in the apartment of Jacqueline Thomas, and Hubbard produced and showed the other boys a .22-caliber rifle which had the barrel sawed off. As the group left the apartment with the rifle they saw Stephen E. Granzyk, an insurance-premium collector, in the hall. Later Jones shot Granzyk, and Jones and Brooks took $35

from his pocket and his watch, and all five boys fled to Hart's apartment. There the money was divided. However, Hubbard gave his share back. Hart put the rifle in a drawer in his sister's room.

In raising the question of whether he was proved guilty as a principal in the murder of Stephen E. Granzyk, the defendant argues that he was not accountable for the conduct of Brooks and Jones, whose conviction of the murder of which the defendant is accused was affirmed in *People v. Brooks (1972), 51 Ill.2d 156,* and he further contends that even if the evidence was sufficient to create an inference that he joined in an unlawful purpose or design with Brooks and Jones, that he nevertheless withdrew from that unlawful purpose, and communicated his intention to withdraw to his co-conspirators. The defendant's argument assumes some apparent force because he was not present at the precise scene of the murder.

The proof introduced during the defendant's trial demonstrates that the five young men were acquaintances, and that the defendant considered Kenneth Hart to be a good friend; that on the evening the offense was committed, they all met in a poolroom located at Madison and Western streets in Chicago; that they left the poolroom together at approximately 7 P.M. that evening and went to the fifth-floor apartment of Jacqueline Thomas, a friend of the defendant Hubbard, located on West Jackson Street in a building in which the defendant lived, being a part of a project area called Rockwell Gardens. In an offer of proof, rejected by the trial court, Hart testified that the group had committed several armed robberies, one of which was committed several days prior to November 20. However, he did say that the defendant had been passive although present, out of fear of going back to jail. He functioned somewhat as a lookout and at times shared in the proceeds of the robberies.

Hart testified that all five left the Thomas apartment

and stood out front when he saw Granzyk, and he said, "When I seen him I started looking at everybody else and everybody started looking at me." Billy Williams testified that he said the man in the hall was an insurance man.

While in Jacqueline Thomas's fifth-floor apartment, the defendant had produced a .22-caliber rifle with a sawed-off barrel for examination by the boys, and he told them it was loaded. He testified that he wanted to return it to its owner, whom he asserted to be Charles Howard. In explanation of his possession of the rifle, the defendant said that Howard had asked him, the day before, to keep the loaded rifle; that Howard had brought the rifle to the defendant's apartment concealed under his (Howard's) coat; that when they met the following day, Howard asked for the return of the rifle and the defendant agreed that he would carry it to the poolroom for exchange, at some unspecified time that evening. The defendant also explained that he had moved the rifle to Jacqueline Thomas's apartment the evening he received it.

While the young men were examining the rifle and passing it around, Jacqueline Thomas's boyfriend arrived and asked that they all leave, which they did. Prior to their leaving, the defendant said that there had been no talk of robbery, or of the presence of the victim in the building.

According to the testimony of Williams, as all five left the apartment, a man, who was carrying a book and who was obviously an insurance-premium collector, was observed standing in the hallway, about to descend a middle stairway. Suddenly, according to the defendant, Jones grabbed the rifle from the defendant's hands and ran away with it. Jones and Brooks pursued the insurance man down the middle stairway while the defendant and Hart went down another stairway and Williams went up another stairway. Thus, the group fanned out around Granzyk. All but Williams met in a stairway about 25 feet from where Granzyk was standing in a hallway waiting for an elevator.

The defendant asserts that he did not know what was

going on, yet he did not inquire of Jones where he was going with the rifle or why.

It was within the province of the jury to consider all facts and circumstances of the case in determining whether the group, and each individual thereof, was participating in a common purpose to rob Granzyk. This was an issue of fact for the determination of the jury and its determination will be set aside by this court only where the evidence is so unsatisfactory as to leave a reasonable doubt as to defendant's guilt. (*People v. Glover (1971), 49 Ill.2d 78, 84.*) In *Glover*, at page 84, this court stated: "It is axiomatic that it is the function of the trier of facts to determine the credibility of the witnesses, and its finding of guilty will be disturbed only when the evidence is so unsatisfactory as to leave a reasonable doubt as to defendant's guilt." Such is not the case here.

The defendant testified that when he and his companion arrived at the scene where they met Jones and Brooks, Jones had opened the door to the stairway and was pointing the rifle at the victim; that the defendant "snatched" Jones from the doorway and that a struggle then ensued over the gun during which they all began laughing, and that the defendant and Hart then left, with Jones still holding the weapon. They returned to the fifth floor and were talking to Jacqueline Thomas and her boy friend when they heard the shot. They immediately returned to the scene where they found Jones and Brooks standing over the body of the insurance man. In *People v. Armstrong (1968), 41 Ill.2d 390.* at 398-399, this court stated:

> "The next contention of defendants involves a request to depart from the long established common-design rule, *i.e.,* that where defendants have a common design to do an unlawful act, then whatever act any one of them does in furtherance of the common design is the act of all and all are equally guilty of whatever crime is

committed. (*People v. Tarver, 381 Ill. 411.*) Presumably this argument is made on behalf of Armstrong, as it is Sumlin who fired the fatal shots, whereas Armstrong, using the shotgun, only mangled the decedent's arm. Such an argument is strange indeed, and, of course, wholly unimpressive. If anything, the facts of this case only serve to further buttress the established rule that on such a foray as these defendants embarked, all are equally liable for the consequences of their individual acts. We have fully reiterated our support of this rule in recent cases, *People v. Rybka, 16 Ill.2d 394; People v. Johnson, 35 Ill.2d 624,* and we continue to do so in this case."

There is no doubt that Ivory Hubbard initially had possession of the weapon which killed Stephen Granzyk. The defendant attempted to attribute his removal of the rifle from Jacqueline Thomas's apartment to a desire to return the weapon to the alleged owner, Charles Howard. Hubbard testified that he intended to take the rifle to a pool hall, to return it to Howard. While it appears that the defendant was opposed to the shooting of the deceased, there was sufficient evidence for the jury to find that he was part of a conspiracy to commit robbery, and that he, in fact, did acts which were intended to aid, abet and accomplish the robbery. It can also justifiably be inferred that he approved of the use of the rifle as a means of frightening the victim. The facts supporting the defendant's story that he desired to return the rifle to a friend are not inconsistent with the inferences of a dual purpose, and there is ample evidence for a finding that he was accountable for the murder of Granzyk as a principal in the robbery.

Four of the five boys were at the fourth floor prior to the shooting and the robbery, and all 5 of the boys arrived at the scene after hearing the shot and fled to Hart's apartment where the proceeds of the robbery—$35—were

divided. The defendant refused to accept any money, and the rifle was left in Hart's apartment.

The following day the police, while investigating the victim's murder, received an anonymous telephone call which led them to a boy who stated that he had been told by the defendant that he, the defendant, had seen some boys shoot an insurance man while robbing him. The police then went to the home of the defendant, and after first telling the police he was the defendant's brother, the defendant conceded his identity and then told the police he had knowledge of the occurrence, but denied participating in it. He agreed to point out the buildings and' apartments where the various parties lived and generally to help locate them. The defendant then accompanied the officers in their squad car and directed the police officers until they finally located and arrested the others. Before taking them to the police station, the officers bought sandwiches for lunch for themselves and the boys.

On arrival at the police station, the boys were placed in one room where they ate their sandwiches, and the officers sat in an adjoining room where they ate their lunch. The door between the two rooms was open, and the officers overheard a conversation among the three boys wherein defendant was asked why he was not under arrest, and was accused of participating in the crime and receiving money. The defendant, in this conversation, said he gave the gun to Brooks, but Brooks said he gave it back. The defendant then said he gave it to Jones, and gave his share of the money back, and that Jones shot the man. Brooks also said Jones shot the man.

At this point, one of the detectives returned to the room, placed the defendant under arrest, and advised him of his rights. The defendant then made certain oral statements concerning the offense, and about two hours later the detective said that he would bring the defendant's co-operation to the attention of the State's Attorney's office. Several hours later, an assistant State's Attorney

took a full written statement from the defendant after advising him of his constitutional rights. The defendant at that time assured the assistant State's Attorney that he had not been made promises of any kind. The written and oral statements of the defendant were used against him in his trial.

The defendant contends that he was tried and convicted under section 5–2 of the Criminal Code (Ill. Rev. Stat. 1967, ch. 38, par. 5–2) wherein a defendant may be charged as a principal if "with intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such person in the planning or commission of the offense." The statute exonerates such a person from accountability, however, if he withdraws from the illegal enterprise, *i.e.,* if, "Before the commission of the offense, he terminates his effort to promote or facilitate such commission and does one of the following: wholly deprives his prior efforts of effectiveness in such commission, or gives timely warning to the proper law enforcement authorities, or otherwise makes proper effort to prevent the commission of the offense." Par. 5–2(c)(3).

In the case at bar the defendant did not wholly deprive his prior efforts of effectiveness in the commission of the murder; he failed to recover the gun from Jones, who shot Granzyk, and he never gave timely warning to Granzyk or law-enforcement officers or made other efforts to prevent the murder.

The defendant next asserts that the trial judge improperly restricted the cross-examination of the principal State's witnesses, Kenneth Hart and Billy Williams. Although we agree that defense counsel had a right to put leading questions to the witness, an examination of the record indicates that the questions objected to were more than leading, and did in fact, in several instances, put words in the witness's mouth. The general rule is that the latitude to be allowed in cross-examination of witnesses rests in the discretion of the trial court. This court long

ago stated that in the absence of a clear abuse of that discretion, a reviewing court will not find reversible error where cross-examination might have been unduly restricted unless there was a clear abuse of this discretion, resulting in manifest prejudice. *People v. Halteman (1956), 10 Ill.2d 74, 81; People v. Jones (1931), 343 Ill. 291, 295.*

The defendant's next contention is that the trial court erred when it sustained certain objections of the prosecutor and admonished defense counsel in the presence of the jury. The comments were made after defense counsel persisted in leading the State's witness in such a manner as to be, in effect, testifying himself. The admonishments were made in response to direct pleas from the defense counsel to the court requesting guidance as to how to properly cross-examine the witness. We have examined the record and believe the trial court's remarks were not such as to prejudice the defendant. The record indicates many questions were asked and answered, objections were made, and some remarks were made by the court.

*People v. McCain (1963), 29 Ill.2d 132, 134,* established that the court has discretion to restrict the scope of cross-examination, and it appears from the record that any admonitory language used by the court was used in a discussion with defense counsel. While it may have been better if the judge had admonished counsel outside the presence of the jury, we do not consider the language here to constitute reversible error in the light of the circumstances involved.

Lastly, the defendant urges that his constitutional rights were violated when testimony of his oral and written statements was admitted in evidence. He asserts that the statements and confession made by him before he was a suspect, and before he was arrested, including those overheard by the police officers, were incompetent because he was not given adequate *Miranda* warnings, and because he was in fact undergoing custodial interrogation. We find no merit in this contention.

This identical contention was also raised in *People v. Brooks (1972), 51 Ill.2d 156,* and we there rejected it. Nothing in the record indicates that defendant's statements were given other than voluntarily. This court and the United States Supreme Court have often held that statements made in response to routine investigatory questions, and asked during a brief initial period of noncoercive detention are admissible. *People v. Burris (1971), 49 Ill.2d 98; People v. Thompson (1971), 48 Ill.2d 41; People v. Bey (1970), 45 Ill.2d 535; Lowe v. United States (9th Cir. 1969), 407 F.2d 1391.*

The defendant also claims, as a subsidiary argument, that his oral statements and confession were inadmissible because the police officer promised to inform the State's Attorney of his co-operation. We find no merit in this contention. The identical argument was rejected in *People v. Hartgraves (1964), 31 Ill.2d 375.*

The judgment of the circuit court of Cook County finding the defendant guilty is therefore affirmed.

*Judgment affirmed.*