THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CLEO HISTER, Defendant-Appellant.

(No. 57803;

First District (2nd Division)—June 10, 1974.

DOWNING, J., dissenting.

Ronald Butler and Thomas B. Donovan, both of Winston & Strawn, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and William K. Hedrick, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LEIGHTON delivered the opinion of the court:

A two-count indictment charged Cleo Hister and Joe Newson with the murder of Richard Wilson. They were tried by a jury, convicted and sentenced, each to a term of 16 to 30 years. Newson took an appeal and another division of this court reversed his conviction because "[u]nder all the circumstances it cannot be said that the People's evidence proved that [he] was a party to the killing of Richard Wilson." See *People v. Newson*, 133 Ill.App.2d 511, 518, 273 N.E.2d 478.

In this appeal by Hister, he presents five issues. I. Whether he was proven guilty beyond a reasonable doubt. II. Whether reversal of Newson's conviction by another division of this court is ground for collateral estoppel in this case. III. Whether the trial court erred in denying defendant's motion for a directed verdict at the close of the State's case. IV. Whether the trial court erred in refusing to instruct the jury regarding circumstantial evidence. V. Whether a conversation between a court bailiff and a juror, during the jury's deliberations, so prejudiced defendant as to necessitate reversal of his conviction. We begin with a summary of the material evidence.

## I.

On April 28, 1968, sometime near 10 P.M., Johnny Wilson was driving his automobile in the vicinity of West 65th Street and Harvard Avenue in the City of Chicago. He saw Joe Newson and Warren Parker pass in front of him and enter a nearby building. In his testimony, Wilson told the jury that Newson was carrying a package or bundle which appeared to contain a gun. Although he did not actually see one, Wilson said, "I know it was a weapon he had." Shortly thereafter, Wilson went into a nearby liquor store, made a purchase and then returned to his home. At about 10 P.M., he heard gunfire; and when he went to 305 West 65th Street, he saw his 15-year-old son, Richard Wilson, lying on the street with a gunshot wound on the left side of his face. This wound caused Richard's death two days later.

During the evening of April 28, between 8:30 and 9:00 P.M., 11-year-old Gregory Lee and Tony Lewis were tandem riding a bicycle when Lee saw defendant, Newson and four other persons in an alley on Normal Avenue between 65th Street and 65th Place. At that time, according to Lee, it was "real dark outdoors." Lee told the jury that he saw Newson with a shotgun. Then he said that Newson fired the shotgun at him and Lewis, causing him to take cover behind an automobile. Then Lee said that he saw "Feenanny" (that is, Eugene Adams, another State witness) walking a bicycle along a street and that "* * * one of them, they

shot Feenanny." A short time later, Lee learned of the shooting in which Richard Wilson was wounded.

Between 10 and 10:30 the same evening, Jesse Parnell, a 14-year-old eighth grader, was sitting on the porch of his home. He testified that Richard Wilson and Eugene Adams came to him and asked to borrow his bicycle. He let them have it; they drove off together. Then, Parnell was asked whether, before he saw Wilson and Adams, he saw "* * * anybody who is in court today * * *." Parnell said he had not. Parnell was then asked to point out Newson. He did. After this, he was asked, "Do you see anybody in court today you know?" The record shows that the court reporter did not hear Parnell answer. However, the assistant State's Attorney who was asking the question stated, "Let the record reflect he said 'Fat Boy'." Parnell then was asked if he had said that. He answered, "Yes." Shortly thereafter, he began to give unexpected answers to questions; he became confused and hesitant in his testimony. Therefore, on the State's motion, he was made a court witness and subjected to cross-examination.

Using leading questions, the assistant State's Attorney asked Parnell if after Wilson and Adams had left, Newson "* * * and Fat Boy came up to your porch?" His answer was, "I don't remember." He was next asked, "Did Fat Boy stick a shotgun into your face?" Parnell answered, "Yes." Then, in answer to questions for the State, Parnell told the jury that Newson and defendant left his porch and ran across 65th Street through a gangway between homes on Harvard Avenue. He said he ran behind them and saw Wilson and Adams on his bicycle riding on the sidewalk along 65th Street toward Yale Avenue. Parnell was next asked if when he saw Wilson and Adams, he saw defendant or Newson with anything in their hands. Parnell did not answer. Finally, the assistant State's Attorney said, "Jesse? Answer my question." Parnell then said, "I don't know." Immediately thereafter, he was asked, "Did you see a rifle or shotgun in Fat Boy's hand?" In answer, Parnell said he saw a shotgun in defendant's hands; that defendant shot the weapon at Wilson, discharging it and hitting him in the face. Soon afterward, Parnell said, defendant and Newson entered a yellowish automobile and drove off.

Parnell, still a court witness, was then questioned by defense counsel. He told the jury that when he ran from the porch to the corner of 65th Street and Harvard, he saw Hister behind a wall of a building and saw an arm sleeve extend out from behind the wall. He said he did not know where Newson was with relation to Hister, that he did not see Newson behind the wall and that he could see nothing behind the wall but the

arm. He said he heard a gunshot and saw Adams run. He said that after the shot was fired, he ran back to his porch and saw no more; but when pressed, he said that after the shot was fired, he saw three persons run from the scene, enter and drive off in a yellow hard-top automobile. He testified that because of poor lighting conditions, he was unable to see the heads or faces of the three persons.

The next witness was 13-year-old Dale Lee who testified that on the night in question she was with a group of friends on a porch near 65th Street and Harvard Avenue. At about 9 P.M., Newson came there and asked if anyone had seen Eugene Adams. Newson, according to Dale, said that Adams had stolen his television, and that for this, he "was going to get" Adams.

Adams was the next State witness. He told the jury that Richard Wilson was his uncle and was with him most of the day, April 28. He said that at about 8 P.M., he talked with defendant and thereafter with Newson concerning a television set. Adams admitted that he and two others had stolen the set. A short time after the conversations, he and Wilson met some youths at 65th Street and Harvard and borrowed two bicycles, one from a Larry Whitmore and the other from a Steve Lannier, on which they rode away, separately. Adams told the jury that he did not know Jesse Parnell; and, on the evening in question, did not borrow a bicycle from him. However, the bicycle he was riding broke down, forcing him to "walk" it. As he was doing so, Adams said that defendant came out of a gangway, running past him and saying, "Burn that M.F." At that point, Adams heard a gunshot. He saw other persons in the shadows, but he did not see Newson. After the gunshot, Adams said he fled the scene on foot, observing Wilson turn the corner and approach him. Adams told the jury that he crossed through a vacant lot on Harvard; and as he did, heard another gunshot. Adams denied he was riding double on a bicycle with Wilson.

The last State witness in presentation of its case-in-chief, was Dwight Gayten, also known as Tony Lewis. He testified that about 9 or 10 P.M., on the evening in question, he and Gregory Lee were riding the same bicycle when Newson and defendant accosted them at the corner of 65th Street and Stewart Avenue. Defendant asked for Eugene Adams and, when an unfavorable response was given, Newson drew a pistol and held Gayten and Lee at gun point 15 to 20 minutes until a passing police car afforded them the chance to escape. Gayten said that someone then fired a shotgun at them. After that, he went to the porch of a neighboring house, from which he heard two more gunshots. A short time later, according to Gayten, he saw defendant and Newson drive off in a 1962 or 1963 Chevrolet.

With the testimony of these witnesses and that of a pathologist who gave the shotgun wound as the cause of Richard Wilson's death, the State rested its case. Defendant's defense was an alibi. In its support, he called his mother, his brother, his sister and a young woman with whom he was living at the time. He testified to his whereabouts on April 28, 1968, between 6 and 11:30 P.M. He denied killing or participating in the killing of Richard Wilson; he denied ever knowing his codefendant, Joe Newson; he denied that he had a nickname "Fat Boy." His sister, the only witness asked the question, told the jury that her brother had never been known by that nickname.

Newson's defense was also an alibi. In its support he called ten witnesses. In addition, he testified, gave the details of his whereabouts during the evening in question and denied ever knowing defendant. He told the jury, categorically, that he did not kill or participate in the killing of Richard Wilson. After both defendants rested their respective cases, witnesses in rebuttal and surrebuttal were called and testified in support of the State's claim that Newson was present at the time of and near the scene of the shooting. Some gave testimony concerning the description of the assailants; others testified to what they said was the residence of Newson and his brothers. This is the evidence from which defendant presents the issue whether the State proved, beyond a reasonable doubt, that in the evening of April 28, 1968, he committed murder by shooting Richard Wilson with a shotgun. The issue is resolved by application of well known principles of our criminal law.

## II.

■■ In the prosecution of a criminal case, it is the burden of the State to present evidence which proves beyond a reasonable doubt not only that a crime was committed, but that the accused was the party who committed or participated in the commission of that crime. (*People v. Burgard*, 377 Ill. 322, 36 N.E.2d 558; *People v. Newson*, 133 Ill.App.2d 511, 273 N.E.2d 478.) Where conviction for a crime depends on the identity of an accused, a reviewing court will examine the evidence of identification because a conviction that rests on identification which is doubtful, vague and uncertain, will be reversed. (See *People v. Christocakos*, 357 Ill. 599, 602, 192 N.E. 677; *People v. Cook*, 113 Ill.App.2d 231, 252 N.E.2d 29.) Our supreme court has said that a guilty verdict cannot rest on identification evidence which does not produce an abiding conviction of guilt. *People v. Fiorita*, 339 Ill. 78, 170 N.E. 690; *People v. Kidd*, 410 Ill. 271, 102 N.E.2d 141.

■■ In the case before us, there was evidence of an alibi. This evidence, if believed, proved that, at the time and place in question, defendant

was not Richard Wilson's assailant because he was too far from the scene of the crime to have committed it. (*People v. Ritcheson*, 396 Ill. 146, 71 N.E.2d 30; *People v. Brown*, 118 Ill.App.2d 41, 254 N.E.2d 654.) In contradiction of this alibi, all of the State's evidence against defendant concerned his identity as the person who shot and killed Richard Wilson. Proof of an alibi cannot be disregarded where the sole and only evidence contradicting it concerns defendant's identity as the person who committed the crime. *People v. Peck*, 358 Ill. 642, 193 N.E. 609; *People· v. McGee*, 21 Ill.2d 440, 173 N.E.2d 434; *People v. Martin*, 95 Ill.App.2d 457, 238 N.E.2d 205.

The record shows that in. its case-in-chief, the State called seven witnesses. One was Johnny Wilson, Richard Wilson's father. Another was Dr. William Quinton Sturner who performed an autopsy on Richard Wilson two days after he was shot and testified to the cause of his death. Therefore, these two witnesses did not give any evidence that connected defendant with the shooting of Richard Wilson.

The other five witnesses were neighborhood young people, ranging in age from 11 to 17 years, none of whom claimed that prior to the evening in question they had seen the person they said was the defendant. All who were asked, however, admitted that they had never seen that person before. Therefore, with these facts in mind, we have examined the testimony of these young people; and being mindful of their immaturity, their difficulty in responding to questions and the pressure of their appearance as witnesses in a criminal case, we think it is a fair summary to say that the evidence they gave was confusing and contradictory.

In *People v. Newson*, 133 Ill.App.2d 511, 273 N.E.2d 478, another division of this court reached the same conclusion when it reversed Newson's conviction. Speaking through Mr. Justice Burke, the most experienced appellate court judge in this State, and referring to the testimony of these young people, the court said that "[f]urther contradictions and inconsistencies exist between the testimony of many of the People's witnesses, most of whom were in their early teen-age years: some of them stated that Hister and defendant Newson were looking for the deceased prior to the shooting, whereas others stated that Hister and Newson were looking for Adams. Many of the People's witnesses were unable to tell the difference between north and south, east and west, yet they testified as to the locations where they said they saw Hister and Newson and other interested persons. There were also discrepancies between defendant Newson's clothing, the automobile he was allegedly driving, descriptions of. defendant Newson himself, the type of weapon brandished, who brandished the weapon, and the like,"·

Clearly, this appraisal was not limited to Newson's contention that he was not proven guilty beyond a reasonable doubt; it was a general appraisal of the evidence, without regard to the defendant involved.

The same appraisal applies particularly to the State's real witness against defendant, Jesse Parnell, the 14-year-old boy who said he saw Richard Wilson get shot. Despite this important fact, when the State went to the grand jury in this case, its witnesses were the police officer who investigated the shooting of Richard Wilson and a person named Roosevelt Allen. The officer was a witness in the trial, but Allen was not. In fact, his name was not on the State's list of witnesses. Nor was Jesse Parnell's. However, on the day of trial, with jury selection about to begin, the State moved for leave to amend its list of witnesses and add the name of Jesse Parnell. Over defendants' objections, the motion was granted with the understanding that defense counsel could interview Parnell before he testified. The interview took place; and later, counsel for defendants told the trial judge that, from their observation, Parnell was under the influence of an assistant State's Attorney prosecuting the case and was being bullied by an older brother. At the insistence of Newson's counsel, and with the cooperation of the assistant State's Attorney in charge, the brother was asked to leave the courtroom while Parnell testified.

When he did, Parnell immediately exhibited an inability to understand and answer the questions put to him. At the request of the assistant State's Attorney, there was a conference in chambers. In the colloquy between court and counsel that followed, Parnell was described as being "confused" and "nervous." Then, following another attempt to get answers from him, the State requested that he be made a court witness.[1] The request was granted; and thereafter, Parnell was asked leading questions most of which he answered by indicating affirmative agreement. During one phase of his testimony, he was asked to identify the defendants. He did not hesitate in pointing out Newson as one of the three persons he said he saw in the evening that Richard Wilson was killed. But when he came to the place where defendant was sitting, the record shows that Parnell gave no response to the request that he point him out. Yet, the examining assistant State's Attorney, after requesting an answer and getting none, asked that the record show Parnell as having said, "Fat Boy" and identifying defendant by that nickname. Defendant, however, testified and denied he had ever been known by that nickname.

---

[1] Although defendant does not raise the question, we notice that the State made no attempt to qualify calling Parnell as a court witness. See *People v. Cardinelli,* 297 Ill. 116, 130 N.E. 355; *People v. Moriarity,* 33 Ill.2d 606, 213 N.E.2d 516; *People v. Mostafa,* 5 Ill.App.3d 158, 274 N.E.2d 846.

His sister, who was the only witness asked, corroborated defendant's denial and said she had never known her brother to use the nickname, "Fat Boy." The State did not rebut this testimony; and our examination of the State's case-in-chief discloses that no prosecution witness testified that, to his knowledge, the defendant, prior to April 28, 1968 had used or responded to the name "Fat Boy."

What is more important is the contradiction of Jesse Parnell by Eugene Adams, who the State was not required to call as a court witness. Parnell had testified that on the evening of April 28, 1968, Adams and Richard Wilson borrowed a bicycle from him and rode off on it together. Adams, in contradiction, testified that not only had he and Wilson not borrowed a bicycle from Parnell; he did not know Parnell at all. Adams told the jury that during the evening in question, he and Wilson had, in fact, borrowed two bicycles, naming the lenders. Adams then testified and crucially contravened Parnell when he said that just before he heard some shooting, he heard the person he said was defendant say, "Burn the M.F." Obviously, then, this person did not have a gun; his words suggest that he was calling to someone who did.

In addition, Parnell contradicted himself. He gave inconsistent versions about the approach of defendant and Newson to the porch of his home when he said he was threatened with a shotgun concerning the whereabouts of Adams. At one time Parnell testified that defendant and Newson came to him and demanded to know where Adams was. At another point, he said that it was Richard Wilson they asked for. At one point, Parnell told the jury that he saw Wilson when he was shot because Wilson and Adams were riding double on his bicycle. Yet, Adams told the jury that during the entire evening, he and Wilson were riding separate bicycles. Parnell told the jury he saw defendant shoot Wilson. However, on further examination, he testified that the only thing he saw was an arm reaching out from behind a wall of a building, yards away from where he was standing in a darkened vacant lot. When he was questioned further, Parnell said he did not see defendant's body nor did he know where Newson was when he saw the flash of the shotgun fire. Although he initially said that he saw Newson and defendant run from the scene and enter an automobile, he later changed his testimony and said that he saw three persons run from the scene and that he did not see the heads or faces of any of those persons who later entered an automobile and drove away.

■■ It is an ancient and consistent rule of our criminal law that where evidence is conflicting, or even contradicting, resolution of the conflict or contradiction is for the jury; it is the jury that must decide which witness or witnesses shall be believed. (*Hiner v. People*, 34 Ill.

297; *People v. Gormach*, 302 Ill. 332, 134 N.E. 756; *People v. Bolton*, 10 Ill.App.3d 902, 295 N.E.2d 11.) It is a corollary of this rule that a jury verdict based on conflicting evidence is conclusive when it is founded on credible testimony sufficient to convict. (*People v. Kelly*, 378 Ill. 273, 38 N.E.2d 9; *People v. Bardell*, 388 Ill. 482, 58 N.E.2d 24; *People v. Lawrence*, 126 Ill.App.2d 202, 261 N.E.2d 459.) On the other hand, if the credible evidence is insufficient, or is improbable or unsatisfactory, or does not remove all reasonable doubt and create an abiding conviction that defendant is guilty, it is our duty to reverse the conviction. (*People v. Dougard*, 6 Ill.2d 603, 158 N.E.2d 596.) In this case, after reviewing the record, we conclude that the evidence adduced by the People was contradictory in many significant respects and failed to establish defendant's guilt beyond a reasonable doubt. *People v. Newson*, 133 Ill.App.2d 511, 273 N.E.2d 478.

## III.

Having reached this conclusion, it is unnecessary that we resolve the other issues presented. The judgment is reversed.

Reversed.

HAYES, P. J., concurs.

Mr. JUSTICE DOWNING dissenting:

I would affirm for the following reasons:

## I.

The majority opinion presents the troublesome situation which always develops when an appellate court reviews the evidence, the credibility of witnesses, the weight of evidence, and then sets aside a jury verdict of guilty.

The trial of this case involved two defendants, each represented by privately retained, experienced and competent counsel. It lasted 9 court days. It is reported in just over 1,000 pages of trial proceedings. The State called 7 witnesses in its case-in-chief, defendant Newson called 11 and defendant Hister 5; the State in rebuttal called 6 witnesses; in sur-rebuttal the State called 1 witness and defendant Newson 3.

Thus, 33 witnesses appeared before the jury and trial judge. The jury and trial judge had a full opportunity to see and hear each witness, the length of time and manner in answering questions, the demeanor, and the apparent interest, bias or prejudice each witness may have displayed. In this case there is no dispute that there was conflicting, contradictory testimony. When such a condition arises, the trier of fact is charged with the awesome responsibility of evaluating the credibility of witnesses and the weight to be given to their testimony.

In *People v. Glover* (1971), 49 Ill.2d 78, 84, 273 N.E.2d 367, our supreme court said:

> "It is axiomatic that it is the function of the trier of the facts to determine the credibility of the witnesses, and its finding of guilty will be disturbed only when the evidence is so unsatisfactory as to leave a reasonable doubt as to defendant's guilt."

See also *People v. Hubbard* (1973), 55 Ill.2d 142, 147, 302 N.E.2d 609.

The majority opinion in concluding that defendant's guilt was not established beyond a reasonable doubt did so after a thorough, painstaking reading of the cold record. However, in my opinion the majority has in effect reweighed the evidence without the benefit of seeing the 33 witnesses. My experience in the trial courts has taught me that one of the most significant ingredients so necessary in determining credibility is the actual appearance and the opportunity for a visual evaluation of each witness sitting in the witness chair, responding to questions from the prosecutor and defense attorney.

It is also to be noted that the experienced, able trial judge who patiently permitted each party to present all their relevant and material testimony had the same opportunity as did the jury to observe the witnesses. After the jury verdicts of guilty of murder as to each defendant, and after extensive written post-trial motions and arguments, the trial court denied each defendant's motion for a new trial, for judgment notwithstanding the verdict and in arrest of judgment.

This court in reviewing the judgment of guilty on the jury verdict, as I understand the law, is not to resolve the question of reasonable doubt as does the original trier of fact. What I, as the trier of fact or trial judge in a jury case, might have done under this set of facts is highly speculative, because I cannot now properly evaluate the full import of each witness's testimony without the opportunity of having seen the 33 witnesses. Therefore, I must be guided only by the principles applicable to appellate review.

In *People v. Rawls* (1945), 389 Ill. 110, 113, 58 N.E.2d 895, our supreme court stated:

> "All of these facts, and many more of a minor nature, were presented to the jury at the trial. This court has repeatedly held that it is the special province of the jury, which sees and hears the witnesses, to decide, in cases of contradictory testimony, who shall be believed, and the court will not interfere with the jury's decision unless satisfied that the evidence is clearly insufficient to remove all reasonable doubt of the defendant's guilt. (*People v. Barnwell,* 296 Ill. 67.) In *People v. Maciejewski,* 294 Ill. 390, where the testimony of a witness was not positive as to identifica-

tion, it was held competent and admissible, its weight being a question for the jury in connection with the other circumstances in the case. The law has committed to the jury the determination of the credibility of the witnesses and the weight to be accorded to their testimony. Where the evidence is merely conflicting, this court will not substitute its judgment for that of the jury, and this rule applies to contradictory evidence on alibi. *People v. Stephens*, 297 Ill. 91."

See also *People v. Kelly* (1941), 378 Ill. 273, 275, 38 N.E.2d 9; *People v. Williams* (1968), 40 Ill.2d 522, 526, 240 N.E.2d 645, 648; 15 I.L.P. *Criminal Law*, sec. 911.

It is also important to consider the statement of our supreme court in *People v. Anderson* (1964), 30 Ill.2d 413, 415, 197 N.E.2d 24:

"The prosecution correctly states the rule that the determination of the credibility of witnesses and the weight to be given their testimony is committed to the jury and we will not substitute our judgment for that of the jury merely because the evidence is conflicting. It is basic, however, that if, after due consideration, we are of the opinion that defendant's guilt has not been established beyond a reasonable doubt, it is our duty to reverse."

As the majority opinion notes, the appeal of codefendant Newson was considered by the first division of this court. It is reported in *People v. Newson* (1971), 133 Ill.App.2d 511, 273 N.E.2d 478. My reading of that opinion leads me to the conclusion that the first division of this court *only* held that the State's evidence did not prove that Newson was a party to the killing of the deceased (see 133 Ill.App.2d 516, 518). Defendant Hister in his oral argument before this court urged that the conviction of Hister must be reversed by virtue of the *Newson* opinion on the theory that the doctrine of collateral estoppel applied.

The doctrine of collateral estoppel operates to preclude relitigation by the same parties, or their privies, of any issue directly adjudicated or necessarily involved in a judgment or decree rendered on the merits. (See *Palma v. Powers* (N.D. Ill. 1969), 295 F. Supp. 924, 933.) Hister was not a party to the *Newson* appeal. In fact at the trial Hister testified he did not know Newson. In my opinion the doctrine of collateral estoppel cannot be invoked by Hister in consideration of his appeal.

Counsel for Hister cited no authority, nor has my research discovered any authority, to suggest that the reversal of the Newson conviction and this court's opinion therein, acts as a bar to this division of this court to independently evaluate the evidence as applicable to Hister. Of course I do not suggest that the majority opinion in fact invoked and applied the doctrine of collateral estoppel.

It is also significant to note that Newson's conviction was based solely upon circumstantial evidence while as to defendant Hister's there was evidence before the jury by Jesse Parnell who identified defendant Hister as the person who had fired the shot at the deceased. Considering this distinction and the fact that in the *Newson* appeal this court confined itself to a review of the testimony as it related only to Newson, in my opinion we are not bound by the first division's opinion.

I agree with the majority that the *Newson* opinion should receive thoughtful, respectful consideration. Nevertheless, I understand it is my duty to make an independent evaluation of the Hister appeal *solely* on the basis of the record in this case as applicable to Hister.[1]

## II.

The record indicates conflicting and contradictory testimony—between State witnesses, between witnesses of the State and Hister, and between Hister's witnesses.

Hister contends that the evidence produced by the State shows nothing more than that Richard Wilson was shot on April 28, 1968, and that the record does not contain any credible evidence which definitely placed the defendant at the scene of the crime—in short, the State failed to sustain its burden of proof beyond a reasonable doubt. Moreover, defendant maintains, the quality of the testimony of the youthful witnesses, and the inconsistent and controverted nature of the "facts" elicited, militate solidly against sustaining the verdict imposed.

It is to be noted that the witnesses who were present on the evening of April 28, 1968, in the said area were youngsters of 11 years and older. Nevertheless, it cannot be denied there is adequate, competent evidence, which the jury apparently believed, that, on the evening of April 28, 1968, defendant Hister with Newson roamed the neighborhood of 65th Street around Harvard, Parnell and Stewart Avenue, brandishing weapons while searching for Eugene Adams or the deceased with the expressed intent of doing physical harm.

The record clearly shows that six State witnesses[2] gave testimony which placed Hister in the area on the critical date and within the crit-

---

[1] The cases of *People v. Ephraim* (1st Dist. 1971), 133 Ill.App.2d 310, 273 N.E.2d 225 (which reversed a murder conviction of William Ephraim, whereas the same court approximately two years later affirmed the murder conviction of co-defendant Leroy Hairston), and *People v. Hairston* (1st Dist. 1973), 10 Ill.App.3d 678, 294 N.E.2d 748, illustrate the fact that this court has followed the practice of separately evaluating the evidence as to each defendant.

[2] The witnesses were Gregory Lee, Tony Lewis, Dale Lee, Clemaine Jean Lee, Eugene Adams and Jesse Parnell.

ical time period; that four witnesses (Dale Lee, Tony Lewis, Jesse Parnell and Gregory Lee) gave testimony placing firearms in the hands of Hister or Newson; and that Jesse Parnell and Eugene Adams testified that Hister was wearing a green and black sweater.

Jesse Parnell, called as a witness by the State, testified that he was 14 years old and on April 28, 1968, lived at 6508 South Harvard and saw the deceased and Adams about 10 or 10:30 at night when they got on his bike and saw them turn the corner of 65th and Harvard; that he knew and identified defendants Newson and Hister in the courtroom, then gave contradictory testimony as to whether he saw them after the deceased and Adams left with his bike.

Thereupon, on motion of the State, Parnell was called as a court's witness. Parnell then testified that after the deceased and Adams rode off on the bike he was on his porch when Hister came up on his porch, stuck a shotgun, having a wooden part cut off with a big hole in the barrel being about 22 or 24 inches long, in his face or head and asked where the deceased was, to which Parnell said he did not know, that Newson and a light boy were there at that time on the sidewalk. Parnell described the gun as having a wooden part cut off with a big hole in the barrel with a barrel about 15 inches long; and that Hister had on a green-striped sweater, some black pants and black shoes.

According to Parnell, Hister and Newson left his house, ran to and up a gangway on 65th and Harvard on the opposite side of the street from his house; that Parnell then crossed the street and went to the corner of 65th and Harvard in front of 6501 where he saw the deceased and Adams on 65th Street going toward Yale; that Hister had a gun in his hand which he shot toward the deceased who was shot in the face on the left side; and that one Kenneth and a girl named Pam were also there. Parnell said he then ran to his porch and saw Hister, Newson and the light boy jump in a car on 65th and Harvard and drive away.[3]

On cross-examination by Newson's attorney, Parnell testified that at the time of the shooting, Hister was in a lot behind the corner of a building and that he saw an arm with a green-striped sleeve stick out; that after the shot was fired, Adams jumped off the bike and ran; that the three persons then jumped into a yellowish car with Hister driving; and that he (Parnell), after running home, came back and saw the deceased lying on the corner.

In response to questions by Hister's attorney, Parnell said he could only see the arm; that he knew who it was because he had the green

---

[3] Various State witnesses testified about the car. Their description of the car did not differ materially from Newson's testimony that at the time he owned a two door '65 Oldsmobile, beige in color with red streaks and a black-vinyl top.

sweater on when he came up on the porch; that he saw the light boy when the gun was shot; that after the shot they turned around, came out through the gangway and jumped into the yellow car and headed towards Stewart Street; and that he heard one shot.

My review of the entire record indicates that the jury had before it legally competent, credible evidence from which it could conclude that on April 28, 1968, Hister was in the area of 65th and Harvard; that he had a gun and held it against the head of Jesse Parnell when Hister and Newson were looking for Adams and the deceased; that Adams and the deceased were riding a bicycle; that Hister had a gun in his hand[4] when a single shot was fired; that Adams jumped off the bike and ran when the deceased was shot on the left side of his head; and that three boys then jumped into a car with Hister driving and drove away. This testimony together with the testimony of the pathologist that the deceased died from a single pellet which entered the left side of the deceased's head, would support the jury's verdict—that the jury believed Hister guilty beyond a reasonable doubt.

Confronted with the task of balancing the testimony offered by the State against the alibi testimony given by Hister and members of his family and girl friend called on his behalf, the jury chose to believe the State's witnesses and returned a verdict of guilty.

That verdict, in my opinion, is not palpably contrary to the weight of evidence, or so unsatisfactory as to cause a reasonable doubt of guilt. *People v. Burgard* (1941), 377 Ill. 322, 36 N.E.2d 558.

Hister presented evidence of alibi. The majority states: "Evidence of an alibi cannot be disregarded where the sole and only evidence contradicting it concerns defendant's identity as the person who committed the crime."

In *People v. Setzke* (1961), 22 Ill.2d 582, 586, 177 N.E.2d 168, our supreme court stated: "There is no obligation on a trial court to believe alibi testimony over positive identification of the accused, even though the alibi testimony may be given by a greater number of witnesses."

In order to understand the nature of Hister's alibi defense testimony, it is important to cite a brief summary of the testimony.

Catherine Hister, mother of defendant Hister, testified that on April 28 the defendant arrived at her home at 6101 South Stewart around 8:30 P.M. with Sandra James; and that he left with his girl friend about midnight.

Bernice Mabry, sister of Hister, testified substantially the same as

---

[4] Witnesses Parnell and Adams testified Hister had on a green and black sweater at the time of the accident.

Catherine Hister, although she identified the girl friend who left with Hister as Hazel Richey.

Furman Hister, brother of defendant, testified that on April 28, 1968, he lived at 6101 South Stewart with his mother; that he first saw the defendant about 6 P.M., at the pool room at 65th and Wentworth;[5] that between 8 and 9 P.M. defendant was at Furman's house where he ate and lay down; and that the defendant's girl friend picked him up between 12 and 12:30.

Defendant Hister testified that on April 28 he was wearing the gray suit he was wearing in court with black loafers; that he left home about 10:30 A.M. with Hazel Richey and spent much of the day visiting with friends and drinking; that between 7 or 7:30 he went to his aunt's house at 64th and Yale, then left there with Sandra and stopped at the Hickory Pit on 63rd Street before arriving at his mother's home at 8; and that after eating and sleeping he left after 12. Hister denied knowing or talking to Eugene Adams, denied pointing a gun at Jesse Parnell or being on his porch, then testified he did not shoot the deceased.

Hister stated no one ever called him Fat Boy[6] and denied knowing codefendant Newson. He testified he had been at a pool room on 65th and Wentworth about 4:30 or 5 and left about 6:30.

Hazel Jean Richey, called as a witness by Hister, testified that on April 28, 1968, she and defendant Hister lived at 5949 South Michigan and that the defendant left home around 12 and she next saw the defendant at 6101 South Stewart about midnight.

It is axiomatic that the jury did not have to believe defendant Hister or his alibi. In fact by their verdict we must conclude the jury did not believe Hister or the alibi evidence.

Thus we return to the question of identification. In my opinion there is credible evidence in the record that placed Hister at the scene of the incident and as the person who shot the deceased. Since the credibility of the witnesses was a question to be decided by the jury, based on the cited authority, I do not think this court should overturn its verdict. The jury obviously believed the testimony of the State witnesses. In *People v. Sullivan* (2nd Dist. 1972), 7 Ill.App.3d 417, 422, 287 N.E.2d 513, the court said: "This court [appellate] will not disturb the finding of a jury in the absence of a clear miscarriage of justice." In my opinion I believe the jury's verdict of guilty should not be overturned.

---

[5] Adams testified that he and the deceased were in a pool hall at 65th and Wentworth from 5:30 P.M. to 9 P.M. on April 28; and that Hister was in the pool hall about 7 P.M. or 8 P.M. at which time Adams had a conversation with Hister.

[6] The parties stipulated at trial that defendant Hister weighed 255 pounds at the time of his arrest.

948

## III.

Although, by virtue of the majority opinion it is not necessary to discuss the other issues raised by Hister in this appeal, I do not believe any of the issues raised would justify a new trial.

For these reasons I would affirm the judgment of the circuit court of Cook County.

